Filed 5/31/18

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, )
)
    Plaintiff and Respondent, )
)              S113421
    v. )
)
WARREN JUSTIN HARDY, )
)         Los Angeles County
    Defendant and Appellant. )    Super. Ct. No. NA039436-02
_____ )

A jury convicted defendant, Warren Justin Hardy, of the first degree murder of Penny Sigler with the special circumstances of murder committed during the commission of robbery, kidnapping for rape, rape, and sexual penetration by a foreign object, and the infliction of torture. (Pen. Code, §§ 187, 189, 190.2, subd. (a)(17), (18).)[1] The jury also found that defendant was an aider and abettor and either had the intent to kill or was a major participant who acted with reckless indifference to human life, but it did not find that he was the actual killer. In addition, the jury convicted defendant of robbery, kidnapping for rape, rape, rape in concert, sexual penetration by a foreign object, sexual penetration by a foreign object in concert, and torture of Sigler. (§§ 206, 209, subd. (b)(1), 211, 261, subd. (a)(2), 264.1, 289, subd. (a)(1).) In connection with the rape and sexual penetration convictions, the jury found true that defendant kidnapped and tortured

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

SEE DISSENTING OPINION

Sigler.  (§ 667.61, subds. (a), (d).)  The jury found not true or did not reach a verdict on allegations that he personally used a deadly and dangerous weapon in connection with the charges.  Defendant admitted a prior robbery conviction.

After a penalty trial, the jury returned a verdict of death.  The trial court denied the automatic motion to modify the verdict and imposed a judgment of death.  This appeal is automatic.

We affirm the judgment.

## I.  THE FACTS

The evidence showed that defendant and two other men, Jamelle Armstrong (defendant's half-brother) and Kevin Pearson, killed Penny Sigler during a robbery and sexual assault.  The crimes took place on the night of December 28–29, 1998, by a freeway embankment in Long Beach.[2]

### A.  Guilt Phase

Sometime after 10:00 p.m., December 28, 1998, Sigler left her Long Beach home with six dollars' worth of food stamps her roommate gave her to buy soda and candy.  Sigler's nude body was discovered the next day on an embankment of Interstate 405 near the intersection of Long Beach Boulevard and Wardlow Road, less than a mile from her home.  Her body was near the bottom of the embankment, separated from the streets by a drainage ditch, and, above the ditch, a nylon mesh fence supported by wooden stakes.  Near Sigler's body was a shoe, a broken stake, and other debris, and blood was in the surrounding area.

---

[2]     The three men were tried separately and each received a sentence of death.  Armstrong's appeal is pending in this court.  This court reversed Pearson's first death sentence.  (*People v. Pearson* (2012) 53 Cal.4th 306.)  On remand, he again received the death penalty.  His appeal from that judgment is also pending in this court.

2

Sigler suffered extensive injuries.  The medical examiner counted 114 injuries, including at least 10 skull fractures that appeared to have been inflicted before death.  Other injuries included blunt force injuries to her face, neck, back, chest, abdomen, arms, and thighs, a partially torn right ear, bruising and bleeding of the neck, broken neck bones, a broken rib, a chipped tooth, and bite marks on her breast and knee.  Sigler also had bruising and lacerations on her internal and external genitalia, perineum, and anus.  Some of the injuries, such as the chipped tooth and the lacerations and bruises to Sigler's genitalia and anus, were consistent with having been caused by a wooden stake.  A wood splinter was recovered from her vagina.  Deoxyribonucleic acid (DNA) from one of the bite marks matched defendant.  The medical examiner concluded that blunt force trauma was the major cause of death, but he also found signs of asphyxiation.

Police recovered the cover of a food stamp booklet near Sigler's body.  Through the booklet's serial number, detectives traced the food stamps to a nearby grocery store.  The store's manager recognized defendant as a regular customer, and remembered that around the time of the murder defendant had purchased food using food stamps.  Detectives executed a search warrant of defendant's home, recovering a pair of shoes with a sole pattern consistent with marks found at the scene, a leather jacket with blood stains, and other articles of clothing.  DNA on the jacket and other clothes in defendant's home matched that of Sigler.

Detectives interviewed defendant the day of the search.  He made three unrecorded statements and one recorded statement based on his third unrecorded statement.  In his first two statements, defendant denied being involved in Sigler's death.  After being told that Armstrong was also in custody, defendant became visibly upset and related a third version of events.  Portions of the transcript and recording of this statement were provided to the jury.

3

According to this statement, as supplemented by later statements to the detectives, defendant was at a friend's home the night of Sigler's death where he, Armstrong, Pearson, and others were drinking. Defendant, Armstrong, Pearson, and two others left around 11:00 p.m. The two others took the "Metro" southbound, while defendant, Armstrong, and Pearson took it northbound to Long Beach. As the three were walking to a bus station along Long Beach Boulevard, they noticed Sigler across the street and, unprovoked, heard her yell at them, "Fuck you, niggers." The three crossed the street to confront Sigler; for defendant, something "clicked" when he heard the slur.

Once they reached Sigler, everyone began yelling at one another. In the process, Sigler grabbed at defendant, and he bit her on her breast in self-defense. Sigler then slapped him in the face. Pearson told defendant and Armstrong to bring Sigler over the fence that ran along the freeway embankment; defendant could not recall how they managed to do so. Pearson then ordered Sigler to lie down, and ordered defendant to remove her shoes. Defendant left to throw away Sigler's shoes as Pearson removed Sigler's pants, but in the process tripped and dropped one of the shoes. When he returned, defendant saw Pearson on top of Sigler, and then Pearson ordered Sigler to orally copulate him. Still angry from earlier, defendant punched Sigler in the jaw twice. Sigler reached out her hand to him and asked for his help, but he did nothing. Armstrong then appeared carrying a wooden stick, which he gave to Pearson. Pearson hit Sigler in the face with the stick, then stomped on her with his boots.

Defendant gathered the clothing and one shoe into a plastic bag he found nearby and climbed back over the fence with Armstrong and Pearson. Looking back at Sigler's body, he saw a stick protruding from Sigler's vagina. He returned to Sigler's body to remove the stick. Defendant gave inconsistent statements as to what happened to the stick: in one version, he threw it into the parking lot; in

4

another, he threw it into a dumpster; and in a third, he gave it to Armstrong, who put it in a dumpster.

The three boarded a bus, transferred to another bus, and went to defendant's home. Somewhere along the way, Pearson discarded the bag with Sigler's clothes. All three left their clothing at defendant's home. Defendant claimed Pearson threatened to kill him if he talked.

The defense cross-examined prosecution witnesses but did not present any witnesses of its own. Defendant stipulated that he had a prior attempted robbery conviction.

## B. Penalty Phase

### 1. Prosecution evidence

Cory Garro testified regarding the facts behind the prior attempted robbery conviction. One night in December 1996, as Garro and his wife were walking to their hotel in Long Beach, three men accosted them. One of the men (not defendant) pressed a gun to Garro's chest. The men demanded Garro hand over his wallet; while one man removed Garro's wallet, another tried to take his wife's purse. She screamed, causing the men to flee. Defendant later told police that he and two other men had attempted to rob Garro and his wife. One of the other men held the gun.

On April 11, 1996, police responded to a call from defendant's residence in Long Beach. There, they found defendant's young son bleeding from a two-inch puncture wound on the back of his leg. Defendant repeatedly told his son to say that the injury had been an accident. Defendant gave conflicting accounts of what had happened, but ultimately he told a police detective that he had a knife in his front pocket with the blade pointing upward. When defendant went to say good bye to his son, he lifted him up and set him on his lap, causing the knife to stab

5

him.  He had forgotten about the knife.  Police found a bloodstained knife with a five-inch blade in a kitchen drawer.

Monty Gmur, whose house defendant had visited before Sigler's death, testified that defendant, Armstrong, Pearson and another man had been working in Gmur's music studio the evening of the murder.  At some point, defendant left and returned with alcohol, which he drank with the other men.  Defendant and the others were at Gmur's house for three to four hours; Gmur was in another part of the house much of this time.  Gmur believed that defendant and the others had been drinking, as they showed signs of intoxication and the alcohol bottles were empty.

Teddy Keptra, Sigler's son, testified about the impact of her murder on him.  He had been 16 years old when his mother died, and subsequently dropped out of high school and had difficulty holding a job.  He missed his mother and thought of her daily.

### 2.  *Defense evidence*

Friends, relatives, and mental health experts testified regarding defendant's childhood, upbringing, and character.

Defendant's mother, Pamela Armstrong, testified that she and defendant's father had been together for three years until Pamela discovered that the father was having a baby with another woman.  She gave birth to defendant in an attempt to get his father back, but the father abandoned her and defendant.  Defendant was born with numerous birthmarks, as well as with an eye that turned to the side.  Defendant had corrective surgery for the eye as a child.  His vision problems caused him to be clumsy and have difficulties at school, problems that the surgery alleviated but did not eliminate.

6

Pamela married Armstrong's father when defendant was one year old, and gave birth to Armstrong when defendant was four or five years old. Armstrong's father was abusive toward Pamela. Although he initially treated defendant well, he increasingly favored Armstrong over defendant as they grew older. Both Pamela and Armstrong's father drank and used drugs, and the physical abuse worsened. On occasion, the teenaged defendant would try to intervene by hitting Armstrong's father and telling him not to hurt his mother. Between his learning disabilities and his deteriorating relationship with his stepfather, defendant's grades worsened, and he eventually dropped out of school. Instead, he spent his time with gang members.

Defendant's family pastor, Albert Scales, testified that defendant had been a well-behaved child at church, and that he had never seen him act in a mean-spirited manner. Scales counselled defendant's mother and stepfather, and was aware that there were drinking problems in the home, that defendant was not well cared for, and that his stepfather was violent towards his mother.

Dr. Carl Osborn, a forensic psychologist, opined that defendant had never fit in at home or school. Defendant's stepfather was a heavy drinker and drug user who was abusive towards defendant's mother, who also drank heavily. Defendant became his mother's caretaker, yet his mother generally sided with his stepfather, leaving defendant feeling unwanted. His home environment was surrounded by violence; his mother and stepfather were violent, his stepfather was involved in gangs, his aunt had been raped and had been involved in a knife fight with his mother, and the neighborhood was the site of several shootings. Once, a man was gunned down in front defendant's house while defendant was watching. At school, defendant was small and had a birth defect that caused severe learning disabilities that were never identified or corrected. Other students consequently

7

picked on him, and his academic performance was poor. In Dr. Osborn's view, defendant desperately sought support, a role model, and a place to fit in.

By age 13, the two bright spots in defendant's life were that he showed some athletic talent and was involved in choir at church. But when he was 13, he had to choose between football and choir. Pastor Millard Jackson told him that if he chose choir, he could go to Disneyland. Because he hated spending time at home, he spent several nights with Jackson. Defendant claimed that Jackson molested him, specifically, that Jackson fondled defendant while he ejaculated. Defendant began a downward spiral after this, hiding behind alcohol and with his only sense of self-worth coming from his gang involvement.

Dr. Osborn opined that defendant's alcoholism stemmed from a dysthymic disorder—defendant was initially unable to recall a time when he had been happy. Defendant continued to drink even while in jail, and the combination of dysthymia and alcohol led to explosive disinhibition, causing violent and impulsive tendencies to manifest themselves. Those tendencies were occasionally directed against defendant himself. His mother testified that at age 16, defendant ran away from home and reported having suicidal thoughts. Tiyarie Felix, the mother of defendant's children, testified that defendant demonstrated suicidal tendencies three times, once pulling a cord tight around his neck, once putting a gun to his head, and once throwing himself in front of a car. These tendencies, in Dr. Osborn's opinion, were consistent with defendant's dysthymia and alcoholism.

Felix also testified about defendant's problems with alcohol. The two met when they were 18 years old, at which time Felix had two sons from a prior relationship. Felix then had two more sons with defendant. Defendant loved all four of her sons equally, and treated them well. But defendant could be abusive towards Felix when he drank. Despite recognizing that his violence was linked to his drinking, defendant continued to drink. Eventually, Felix asked him to move

8

out. Felix also testified about the incident in which defendant's son was cut in the back of his leg. Immediately after the incident, her son told her it was an accident.

Witnesses also testified that defendant was a follower, not a leader. James Johnson ran a community training program that defendant completed. Johnson testified that defendant lacked initiative, but was willing to learn and seemingly wanted a job to support his children. Following the program, defendant worked for Johnson for about a year installing toilets until Johnson's company went out of business. During that time, defendant worked well, but he still tended to be more of a follower than a leader. Felix and Scales supported this view. Dr. Osborn determined that defendant had an I.Q. of 83, putting him in the 13th percentile of the general population. Based on his intellectual abilities and background, Osborn believed that defendant lacked the "horsepower" to lead on the streets.

Based on his sessions with defendant and review of the records, Dr. Osborn came to three conclusions regarding Sigler's death: The crimes would have been out of character for defendant had he been sober; defendant actively participated but was dominated by Pearson and Armstrong; and they were crimes of passion due to defendant's intoxication, because drinking caused defendant to become violent or suicidal.

Dr. Gordon Plotkin, a medical doctor, testified that Sigler's autopsy toxicology report showed that she had ingested methamphetamines and alcohol before her death. Other records showed that she had been diagnosed with depression. Methamphetamines, alcohol, and depression in combination could cause a person to have poor impulsivity and suffer loss of judgment, and could cause that person to have increased aggression and possibly act violently.

Dr. Plotkin also testified that defendant's reported alcohol abuse and drinking on the night of Sigler's death could have meant that he was so intoxicated that he did not remember what happened. His intoxication could have aggravated

any violent tendencies and reduced impulse control. Because defendant remembered some details about the night, including mundane ones, Dr. Plotkin did not think defendant had blacked out.

Robert Grace, a Los Angeles County deputy district attorney, testified regarding defendant's cooperation during a murder prosecution in 1997. Defendant had witnessed a shooting between rival Crips and Bloods gang members. He cooperated with the prosecution to identify suspects and did not recant or change his testimony. His testimony, which put his life in danger, was necessary to obtain convictions for conspiracy to commit murder against Crips gang members. Defendant himself was a member of the Bloods.

### 3. *Prosecution rebuttal*

Monty Gmur testified that at one point during the evening defendant and Pearson asked to use his music studio to "jump in" or initiate someone into a gang, but Gmur refused.

The prosecution presented evidence about an incident on a bus the night of Sigler's death. The bus driver testified he picked up three young African-American men, whom he could not identify, near Wardlow Road and Long Beach Boulevard after midnight. One of them argued over the fare, and the three argued among themselves and a fourth African-American man about gangs. Defendant later told a detective he was involved and the dispute was over Crips, Bloods, and gang colors.

Pastor Jackson, the pastor defendant claimed molested him, testified that, after Sigler's death, he spoke to defendant and defendant's mother about the allegation. Jackson had counselled defendant as a young teenager, and defendant had occasionally stayed at Jackson's house in the spare bedroom. Jackson denied molesting defendant.

10

Sergeant Steve Newman of the Los Angeles County Sheriff's Department testified regarding gangs. He explained that "jumping in" was an initiation process in which a new gang member would be beaten for one to three minutes. Newman testified that a tattoo defendant bore indicated that he was a member of the Bloods. Although the Bloods might frown on a member testifying against the Crips, as defendant had done, it might be tolerated.

## II. Jury Selection Issues

### A. Excusal for Cause of Two Prospective Jurors

Defendant contends the trial court improperly excused two prospective jurors for cause due to their views on the death penalty in violation of his Fifth, Sixth, Eighth and Fourteenth Amendment rights.

"A prospective juror in a capital case may be excluded for cause if his or her views on capital punishment 'would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' (*Wainwright v. Witt* (1985) 469 U.S. 412, 424.) Prospective jurors 'may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings.' (*Id.* at p. 425.) Accordingly, 'deference must be paid to the trial judge who sees and hears the juror' and must determine whether the 'prospective juror would be unable to faithfully and impartially apply the law.' (*Id.* at p. 426.) We apply this standard to determine whether excusing a prospective juror in a capital case for cause based on the prospective juror's views on capital punishment violates the defendant's right to an impartial jury under article I, section 16 of the California Constitution. [Citations.]

" ' "On appeal, we will uphold the trial court's ruling if it is fairly supported by the record, accepting as binding the trial court's determination as to

the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous." ' [Citation.] ' "In many cases, a prospective juror's responses to questions on voir dire will be halting, equivocal, or even conflicting. Given the juror's probable unfamiliarity with the complexity of the law, coupled with the stress and anxiety of being a prospective juror in a capital case, such equivocation should be expected. Under such circumstances, we defer to the trial court's evaluation of a prospective juror's state of mind, and such evaluation is binding on appellate courts.' ' " (*People v. Souza* (2012) 54 Cal.4th 90, 122-123.)

Defendant first argues the test established in *Wainwright v. Witt*, *supra*, 469 U.S. 412, should be modified. However, the United States Supreme Court established that test. If it is to be modified, it is up to that court to do so, not this court. (*People v. Rices* (2017) 4 Cal.5th 49, 79-80.)

Defendant also argues the trial court erred under the *Witt* standard. We disagree. We discuss the two prospective jurors in question.

### 1. The First Prospective Juror at Issue

David D. wrote on the jury questionnaire that he "would initially be leaning towards the defense. I have developed a mistrust of prosecutors." He "abhorre[d]" the death penalty. He was "strongly against it" and viewed it as "cruel and unusual." He stated that the "death penalty is out of step in a modern society as ours," and that it was for the purpose of "revenge" or "political" reasons. He also felt that "the killing of any human being diminishes us all and goes against the laws of nature and man," and that "only the most barbaric countries on earth still impose it."

In response to the question whether he could vote for the death penalty, he responded "no." In response to the question whether he could vote for life in

prison, he responded "yes." He wrote, "I'm not sure," to the question whether he would "automatically vote for life without the possibility of parole, in every case regardless of the evidence presented to you?" In response to the question whether he would "always vote against death, no matter what the evidence might be presented or argument made during a penalty trial," he answered "no."

During voir dire, David D.'s responses were somewhat equivocal. The court asked him whether he could keep an open mind in the penalty phase; he answered, "I believe I can." When the prosecutor asked him whether he could impose the death penalty, he responded, "I'm not sure. I think I have to sit in that jury room and make that decision at the time of the deliberations." Then he expressed the opinion that the death penalty is barbaric, but he believed he could impose it "if it was necessary to follow the law, and the law said this was the only answer to this case." He could impose it only "if it was clear–cut that the law— the law made it very clear that the death penalty had to be imposed. I don't feel that I'm above the law. However, I hold these convictions very strongly. I think if I sat in the jury room and it became very clear there was only one answer, I believe I could impose the death penalty. . . ."

The trial court explained that "the law doesn't say that you have to impose the death penalty. I won't be telling you. You will be telling me. Basically, the court will be asking what is the appropriate penalty." The prosecutor added, "The court is not going to tell you it's a clear-cut in this circumstance. You vote for death in this circumstance [or] you vote for life. It is subjective. Do you believe that you can impose death?" David D. responded, "I believe—I believe I could. It would be very difficult for me. I would have to have almost everyone on the jury trying to convince me that it would be essential or necessary to impose death."

Defendant's attorney explained to David D. that neither the court nor the law would ever require a death sentence and asked whether he could vote for the

13

death penalty. The juror responded, "I'm trying to figure out. This is a huge question. Can I have a couple days to think about it?" He was told no. Later, he said, "If the law states one thing I would feel compelled to follow the law." When the court reiterated that the law will never compel a death verdict, he said he could vote for the death penalty "if the other jurors were able to convince me to vote for the death penalty, I would do it, yes."

Later, when defense counsel asked whether he could "come to a conclusion, after hearing the evidence in the penalty phases, that this was a case which called for the death penalty," David D. responded, "I could, yes."

The prosecutor challenged David D. for cause. The court granted the challenge: "I sort of have a two-fold problem with this juror. One is based on his answers. At least initially, it certainly appeared that his views would prevent or substantially impair his performance as a juror, in accordance with the law. So it would seem at the outset, that he probably could not impose the death penalty no matter the circumstances. The second problem that I have, if he was a juror and the jury did impose death, I'm not sure that that verdict would be worth much because he told us repeatedly if it comes back with the death verdict that means 11 people voted for death and so did he. So I don't think he will be helpful or useful to us in this case. So I'm going to grant the People's challenge for cause."

The record supports this ruling. The court reasonably found that the juror's views in opposition of the death penalty would "prevent or substantially impair" his performance as a juror in defendant's case.

Defendant argues that David D. stated numerous times that he could follow the law and vote for death. But he also made clear that he could impose the death penalty only if the law compelled him to do so, even when the attorneys and the court repeatedly explained to him that the law would never require a verdict of death. (See *People v. Bryant*, *Smith and Wheeler* (2014) 60 Cal.4th 335, 402 [trial

14

court properly dismissed a potential juror based partially on her statement that she would vote for the death penalty only if the law required her to do so.])  Yet when the juror seemed to understand the law correctly, he was unsure if he could impose the death penalty, stating, "I believe – I could.  It would be very difficult for me."

In addition, David D. stated several times that he would only vote for death if the other jurors were able to convince him that death was the appropriate outcome.  When the court stated that a death verdict would not be "worth much," it appeared to mean that had David D. been on the jury, a death verdict would not have reflected a unanimous decision to impose death, but rather an 11–1 vote if David D. voted for death only because he felt pressured to do so.

The record supports the court's ruling excusing this juror due to his views on the death penalty.

### 2.  *The Second Prospective Juror at Issue*

With respect to the death penalty, Kirk F. stated on the questionnaire that it was a "tough moral decision."  He stated that while when he was "younger [he] was for the death penalty, as [he] grew older [he was] more unsure."  He went on to state that he felt the death penalty is used "too seldom."  Nevertheless, he stated that while he supported the death penalty, he "may not be able to make the final decision for the penalty."  He wrote that "taking of another person's life, based on judgment, is difficult from my religious experiences and social awareness."  He also indicated that he could not set aside his religious beliefs, explaining that he would "try to set aside beliefs but [he could not] say for certain [he] will be able to."

When asked if he could, in the appropriate case, "reject[] life in prison without the possibility of parole and vot[e] for the death penalty," he said "no," but explained that he "would need to see the details and the level of involvement

15

as compared to the others." He also indicated that he would not automatically vote for either the death penalty or life without the possibility of parole.

During voir dire, Kirk F. initially stated that he would "try to" keep an open mind and decide between the two penalties. He explained: "Of what I've seen of the case so far, I feel strongly more about the death penalty . . . ." Nevertheless, when the court asked whether he would be able to keep an open mind because he "hadn't firmly fixed in [his] mind what the penalties would be . . . because [he] hadn't heard . . . the evidence," he replied that yes, he would be able to do so.

His answers to questions the attorneys posed were more equivocal. When defendant's attorney asked whether he could vote for death if this was the appropriate case in which to do so, he replied, "Right." But later he indicated that his religious upbringing might interfere with his ability to do so. "I don't know what will happen when I actually try to make the decision, whether I'll just look at what is there or my personal beliefs will—." When defense counsel interrupted to ask what those beliefs were, he mentioned his Lutheran upbringing and said, "I guess it's kind of uncertain for me. I don't know, exactly, where I stand." He said he had beliefs about "taking someone else's life or making that decision to take another person's life."

When Kirk F. indicated that his hesitancy to vote for the death penalty would be due to lingering doubt about the defendant's guilt, defendant's attorney told him that "this case isn't like that. . . . There is going to be physical evidence, DNA evidence, confessions . . . coming out of the mouth of my client as to what he did, and about his involvement. This is not going to be that kind of case where you go, oh, maybe the witness was lying and maybe really he wasn't there, or that kind of thing. . . . So try to think of it in removing any doubt about the actual guilt, now we're just talking strictly about the penalty. With that removed and just

16

thinking about the penalty, would you be able to make a decision considering death or life?"  Kirk F. replied, "Yes. If I was comfortable with that, yes."

On questioning by the prosecutor, Kirk F. said the Lutheran faith is against imposing the death penalty.  He could not say for certain that he could set aside his personal beliefs.

The court excused Kirk F., stating, "It would appear to me that the juror's views on capital punishment would prevent or substantially impair the performance of his duties if he was a juror, in accordance with the law.  So we'll excuse that juror."

This record also supports this ruling.  While his negative views toward the death penalty were less clear than those of David D., he was unable or unwilling to state unequivocally that he would be able to set aside his personal beliefs and vote for the death penalty in an appropriate case.  He gave conflicting answers with respect to his feelings about the death penalty.  While he believed it was not imposed enough, he could never say whether he personally could vote for death. He stated he was not religious, but also that he felt he could not set aside his Lutheran faith, which he believed was against the death penalty.  All of this supported the court's finding of substantial impairment.

### B.  Prosecutor's Use of Peremptory Challenges

Defendant, who is African-American, contends the prosecutor improperly used peremptory challenges to excuse African-Americans due to their race in violation of *Batson v. Kentucky* (1986) 476 U.S. 79 and *People v. Wheeler* (1978) 22 Cal.3d 258.

#### 1.  Procedural Background

The prosecutor exercised five peremptory challenges during selection of the original 12 jurors, one to excuse Frank G., the only African-American who was

available during that part of jury selection.  She exercised all four of her peremptory challenges while picking alternates, two to excuse Darin B. and Marion H., the first two African-Americans who became available during that part of jury selection.  The prosecutor twice passed with Marion H. in the box, then challenged her after the defense exercised two additional challenges.  After both sides exhausted their peremptory challenges for alternates, an African-American was seated as the fourth and final alternate.

After the alternates were selected, defendant objected that the prosecutor had exercised her challenges against African-Americans for reasons of group bias.  He noted that the prosecutor had challenged all three African-Americans that she could have challenged.  The prosecutor argued that defendant had not established a prima facie case, but before the court ruled on the matter, she volunteered to give her reasons for the challenges.  After she gave her reasons as to all three jurors, the court asked defense counsel, "Did you want to respond?"  Defense counsel answered, "No."

The court then denied the motion.  "The court doesn't believe that there is sufficient showing to meet the prima facie finding.  Even if the court had reached that point, the prosecution has explained race neutral reasons for excusing the jurors.  And, naturally, the explanation doesn't have to be one that the court would do, if the court was still a lawyer.  But the only one that was kind of out of the ordinary for the court, was as to the alternate, and I'm not even sure if there has ever been a case that addresses how *Wheeler* would apply to alternates.  It's unlikely that we'll use any of the alternates in this case, and even more unlikely that we'll get to alternate No. 3.  But, nonetheless, just because of the fact when I was a lawyer, just because I might not have done that, doesn't mean that the reason is not sufficient pursuant to *Wheeler*.  So the *Wheeler* motion is denied."

18

## 2. Applicable Legal Principles

"The United States and California Constitutions prohibit exercising peremptory challenges based on race. When a defendant alleges discriminatory use of peremptory challenges, the defendant must first make a prima facie showing of impermissible challenges. If the trial court finds a prima facie case, the prosecutor must then state nondiscriminatory reasons for the challenges. At that point, the trial court must determine whether the reasons are credible and whether the defendant has shown purposeful discrimination under all of the relevant circumstances. The defendant has the ultimate burden of persuasion." (*People v. Melendez* (2016) 2 Cal.5th 1, 14.) "The 'Constitution forbids striking even a single prospective juror for a discriminatory purpose.' " (*Foster v. Chatman* (2016) 578 U.S. __, __ [136 S.Ct. 1737, 1747], quoting *Snyder v. Louisiana* (2008) 552 U.S. 472, 478.)

"At the third step of the *Batson*/*Wheeler* analysis, the trial court evaluates the credibility of the prosecutor's neutral explanation. Credibility may be gauged by examining factors including but not limited to ' " 'the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' " ' [Citation.]" (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1168.)

Here, the court found no prima facie case, but only after the prosecutor had stated her reasons for the challenges. In this situation, "we infer an 'implied prima facie finding' of discrimination and proceed directly to review of the ultimate question of purposeful discrimination." (*People v. Scott* (2015) 61 Cal.4th 363, 387, fn. 1, quoting *People v. Arias* (1996) 13 Cal.4th 92, 135.) Accordingly, "we must determine whether the trial court correctly ruled that the defense did not demonstrate discriminatory purpose at the third stage. The prosecutor's justification does not have to support a challenge for cause, and even a trivial

19

reason, if genuine and race neutral, is sufficient.  The inquiry is focused on whether the proffered neutral reasons are subjectively *genuine*, not on how objectively reasonable they are.  The reasons need only be sincere and nondiscriminatory.  We review the trial court's determination with restraint, presume the prosecutor has exercised the challenges in a constitutional manner, and defer to the trial court's ability to distinguish genuine reasons from sham excuses."  (*People v. Melendez*, *supra*, 2 Cal.5th at pp. 14-15.)

Reviewing the trial court's determination with restraint does not, however, mean abdication.  " 'Although we generally "accord great deference to the trial court's ruling that a particular reason is genuine," we do so only when the trial court has made a sincere and reasoned attempt to evaluate each stated reason as applied to each challenged juror.' [Citation.]  'When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings.  But when the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient.' [Citation.]  However, we also have stated that a trial court is not required 'to make explicit and detailed findings for the record in every instance in which the court determines to credit a prosecutor's demeanor-based reasons for exercising a peremptory challenge.' " (*People v. Williams* (2013) 56 Cal.4th 630, 653.)

"Some neutral reasons for a challenge are sufficiently self-evident, if honestly held, such that they require little additional explication. . . .  Moreover, a peremptory challenge may be based on a broad range of factors indicative of juror partiality, even those which are ' "apparently trivial" ' or ' "highly speculative." ' [Citation.]  Yet when it is not self-evident why an advocate would harbor a concern, the question of whether a neutral explanation is genuine and made in

20

good faith becomes more pressing.  That is particularly so when, as here, an advocate uses a considerable number of challenges to exclude a large proportion of members of a cognizable group." (*People v. Gutierrez*, *supra*, 2 Cal.5th at p. 1171.)

"At this stage, a defendant may engage in 'comparative juror analysis'; that is, may compare the responses of the challenged jurors with those of similar unchallenged jurors who were not members of the challenged jurors' racial group. Such analysis is not necessarily dispositive, but it is one form of relevant circumstantial evidence.  When comparative juror arguments are made for the first time on appeal, . . . the prosecutor was not asked to explain, and therefore generally did not explain, the reasons for not challenging other jurors.  In that situation, the reviewing court must keep in mind that exploring the question at trial might have shown that the jurors were not really comparable.  Accordingly, we consider such evidence in light of the deference due to the trial court's ultimate finding of no discriminatory purpose." (*People v. Melendez*, *supra*, 2 Cal.5th at p. 15.)  "The individuals compared need not be identical in every respect aside from ethnicity:  'A *per se* rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters.' " (*People v. Gutierrez*, *supra*, 2 Cal.5th at p. 1173, quoting *Miller-El v. Dretke* (2005) 545 U.S. 231, 247, fn. 6.)  "[B]ut they must be materially similar in the respects significant to the prosecutor's stated basis for the challenge." (*People v. DeHoyos* (2013) 57 Cal.4th 79, 107.)

In this case, two of the three prospective jurors at issue could only have been selected as alternates.  The trial court stated that it would call the alternates onto the main panel, if needed, in the order they were seated.  During the trial, only one alternate was called to serve on the main panel.  Neither of the prospective jurors at issue would have been in the first seat, and thus neither

would have served as an actual juror. Accordingly, any error as to those two jurors would have been harmless. (*People v. Mills* (2010) 48 Cal.4th 158, 182.) But that does not mean the prosecutor's reasons for challenging them are irrelevant. Those reasons, if unsupported, weak, or implausible, may "be considered part of an overall and deliberate plan to remove all African-Americans from the jury in violation of [the defendant's] constitutional rights." (*Ibid*.)

For this reason, although we will focus on the validity of the prosecutor's excusal of Frank G., we will also examine the prosecutor's excusal of the two other jurors for whatever light it may shed on the validity of her reasons for excusing Frank G.

### 3. *Application to This Case*

For two reasons, the prosecutor's use of peremptory challenges warrants close scrutiny. First, although the numbers are small, she excused every African-American prospective juror she could have excused—one while selecting the main panel and two while selecting the alternates. An African-American was ultimately selected as an alternate, but that occurred only after both parties had exhausted their peremptory challenges. Second, this case had definite racial overtones. Defendant is African-American; the victim was White. Defendant told the police that she had yelled a racial slur at him and his cohorts, triggering the incident.

These circumstances are not dispositive. "[A] prosecutor, like any party, may exercise a peremptory challenge against anyone, including members of cognizable groups. All that is prohibited is challenging a person *because* the person is a member of that group." (*People v. Cleveland* (2004) 32 Cal.4th 704, 733.) But the circumstances are troubling. The fact the prosecutor excused all possible African-Americans is a "probative circumstance[], although [it is] not dispositive, especially considering the small numbers involved." (*People v. Jones*

22

(2011) 51 Cal.4th 346, 362; see *People v. Gutierrez*, *supra*, 2 Cal.5th at p. 1171.) The racial overtones, although again alone not dispositive, "raise[] heightened concerns about whether the prosecutor's challenge was racially motivated." (*People v. O'Malley* (2016) 62 Cal.4th 944, 980.)

We will examine the prosecutor's excusal of the prospective jurors at issue with these and all other relevant circumstances in mind.

Defendant and the dissent (dis. opn., *post*, at pp. 5-6) argue that we should not defer to the trial court's finding because the court did not make " 'a sincere and reasoned attempt to evaluate' " the prosecutor's reasons. (*People v. Williams*, *supra*, 56 Cal.4th at p. 653.) The court essentially made a " 'global finding' " that the reasons were sufficient. (*Ibid.*) But, as we will discuss, the reasons were generally supported by the record, inherently plausible, and self-evident. Some, at least, were strong and have a firm basis in accepted trial strategy. When the trial court invited defense counsel to comment, counsel declined, thus offering nothing to challenge the credibility of the prosecutor's reasons. "Under the circumstances, the court was not required to do more than what it did." (*People v. Jones*, *supra*, 51 Cal.4th at p. 361.) Moreover, as we explain, even if we did not review the trial court's ruling deferentially, no reason appears for this court to doubt the genuineness of the prosecutor's stated reasons.

### a. Frank G.

The prosecutor stated six reasons for excusing Frank G.: (1) "He indicated on question no. 42, 'Police are not always truthful and tend to exaggerate' "; (2) "He speaks to attorneys daily, and knows 50 to 60 civil or criminal lawyers"; (3) "He did not want to sit on this case"; (4) "He was arrested in 1992 by the Los Angeles Sheriff's Department"; (5) During questioning, "he refused to smile at me, although he smiled for the defense"; and (6) "He also indicated that LWOP

[life without the possibility of parole] was worse for a defendant." She said that, "in combination," these were the reasons she "kicked him."

With one discrepancy, the record supports each of these reasons except, of course, the record does not record the juror's demeanor. Collectively, these reasons are inherently plausible and reasonable and have a basis in accepted trial strategy. Considered in combination, they provide ample race-neutral grounds for the challenge. We discuss each reason in the order the prosecutor gave.

Regarding the juror's answer to question 42 on the jury questionnaire, there is a discrepancy. The juror in fact wrote, "I believe prosecutors are not always truthful and tend to exaggerate." Thus, the prosecutor erroneously said this belief concerned "police" rather than "prosecutors." Because the discrepancy was not raised at trial, we do not know whether the prosecutor simply misspoke—saying police when she meant prosecutors—or misremembered—police and prosecutors are closely connected in this context. (Eleven days had elapsed between the individual questioning of this juror and the prosecutor's explanation, and the attorneys had many long questionnaires to review.) But no reason exists to doubt the prosecutor's sincerity or suspect she simply made it up. She correctly quoted the rest of the juror's answer, and it provides a strong reason for excusing the juror. There is "no *Batson* violation when the prosecutor excused a prospective juror for a factually erroneous but race-neutral reason." (*People v. O'Malley*, *supra*, 62 Cal.4th at p. 980 [mistaken recollection that a juror had spoken of prejudice did not establish discriminatory intent].)

In *People v. Silva* (2001) 25 Cal.4th 345, the prosecutor made completely unsupported statements that a juror "would be reluctant to return a death verdict or that he was 'an extremely aggressive person.' " (*Id*. at p. 385.) We found this circumstance critical and reversed the trial court's denial of the defendant's motion. "Although an isolated mistake or misstatement that the trial court

recognizes as such is generally insufficient to demonstrate discriminatory intent [citation], it is another matter altogether when, as here, the record of voir dire provides no support for the prosecutor's stated reasons for exercising a peremptory challenge and the trial court has failed to probe the issue [citations]." (*Id*. at p. 385.) The slight discrepancy here is like the prosecutor's error in *People v. O'Malley*, *supra*, 62 Cal.4th 944, not the one in *Silva*.

It is true that the trial court did not comment on this one-word mistake. Neither did defense counsel. It is unrealistic to expect the trial court to discover the mistake under trial conditions when it was not brought to the court's attention. Many jurors were examined over several days, and hundreds of prospective jurors filled out the 52-page questionnaire containing 237 questions.

When the trial court invited defense counsel to respond to the prosecutor's statement of reasons, counsel declined. This failure to respond is significant. In *Uttecht v. Brown* (2007) 551 U.S. 1, the high court reviewed a claim that the trial court erred in excusing a juror for cause. The defendant had not objected to the excusal. Although the failure to object did not forfeit the claim, the court found it significant to its review of the court's ruling. It noted that "diligent judges often must [rely] upon both parties' counsel to explain why" the juror was not subject to challenge for cause. (*Id*. at p. 18.) "By failing to object, the defense did not just deny the conscientious trial judge an opportunity to explain his judgment or correct any error. It also deprived reviewing courts of further factual findings that would have helped to explain the trial court's decision." (*Ibid*.; see *People v. McKinnon* (2011) 52 Cal.4th 610, 644.)

This concern applies here. By failing to respond when given the chance, counsel deprived the trial court of the opportunity to consider arguments in an adversarial context. Judges necessarily rely on the arguments of counsel. (*Uttecht v. Brown*, *supra*, 551 U.S. at p. 18.) The failure also denied the prosecutor the

opportunity to defend herself against defendant's claims that her reasons were pretextual, thus further denying this court the opportunity to consider any such defense. If defense counsel had noted that the juror had referred to prosecutors rather than police, the prosecutor could have explained herself, and the court could have made a reasoned ruling that we could review. The defendant has the ultimate burden of persuasion regarding the prosecutor's motivation. (*People v. O'Malley*, *supra*, 62 Cal.4th at p. 974.) Under the circumstances, we find defendant did not meet that burden.

Moreover, the one-word discrepancy was minor. Indeed, a precisely accurate statement would, if anything, have provided an even stronger reason for the excusal. The fact that the juror distrusted prosecutors, and not just some of the witnesses, might reasonably be of even greater concern to a prosecutor. As defendant notes, the juror said the same thing about criminal defense attorneys. But this circumstance does not significantly reduce the strength of this reason. Prosecutors, especially, are expected, even required, to be truthful and to seek justice, not a conviction at any cost. (E.g., *Berger v. United States* (1935) 295 U.S. 78, 88.) Moreover, they have the burden of proof beyond a reasonable doubt, unlike defense attorneys, who merely need to raise a reasonable doubt. A juror who distrusts both sides of a case may well be more likely to have a reasonable doubt and thus be problematic for the prosecution. The fact that the juror distrusted *all* attorneys involved in the criminal justice system, and not just prosecutors, does not invalidate this reason. "A prospective juror's distrust of the criminal justice system is a race-neutral basis for his excusal." (*People v. Clark* (2011) 52 Cal.4th 856, 907.)

The record fully supports the prosecutor's second reason. The juror wrote on the questionnaire, "In my occupation I speak with lawyers on a daily basis regarding civil litigation and know about 50-60 civil and criminal defense

26

attorneys." During voir dire, he explained that he supervised civil litigation for Hertz Corporation, that he was currently supervising a case in Santa Monica in which he was a possible defense witness and had "signed all of the discovery and verification responses." Such a close and pervasive connection to lawyers and the judicial system is a legitimate and recognized reason for a prosecutor to exercise a peremptory challenge. (*People v. Clark*, *supra*, 52 Cal.4th at p. 907.) Moreover, the prosecutor might reasonably have found the juror's cynicism about prosecutors and defense attorneys even more troubling in light of his frequent professional contact with lawyers.

The record also supports the third reason. The juror stated on the questionnaire, "I would not like to sit on this jury due to the nature of the alleged crimes." When the prosecutor asked him why he did not want to be a juror in the case, he responded, "Other than it's a big decision, it's probably maybe the length of the trial." He was concerned serving as a juror might interfere with trial in the case he was involved with in Santa Monica. The prosecutor and court explained to him that this trial would probably end before his other trial would begin. Additionally, the court told the juror it had "a great deal of influence with that Santa Monica court." The reassurance seemed to satisfy the juror. Nevertheless, that the juror did not want to sit in the case was a legitimate race-neutral reason. In isolation, especially given the concerns we have expressed, it was also a rather weak reason. Many prospective jurors do not want to sit on a jury in a death penalty case, including some in this case the prosecutor did not challenge. Standing alone, this reason might present a situation where the "question of whether a neutral explanation is genuine and made in good faith becomes more pressing." (*People v. Gutierrez*, *supra*, 2 Cal.5th at p. 1171.) But it does not stand alone. It is a legitimate reason to add to the others.

The record also supports the fourth reason. The juror stated on the questionnaire that he had been arrested in 1992 by "LASD" (presumably Los Angeles Sheriff's Department) due to a "computer error by rental agency." He went to court, but the charge was dismissed. He wrote, "I was falsely accused of stealing a rental auto because of a computer/human mistake." "A 'negative experience with law enforcement' is a valid basis for a peremptory challenge." (*People v. Melendez*, *supra*, 2 Cal.5th at p. 18.) As defendant notes, the juror checked boxes stating that he had been treated fairly by police and justice had been served. But he also said he felt "ambivalent" about the result; in another part of the questionnaire, he wrote that "wrongful accusations" are a major problem with the criminal justice system. Under these circumstances, it was reasonable for the prosecutor to be concerned about a prospective juror who had been falsely arrested regardless of how understanding and forgiving that juror might appear to be.

The fifth reason was based on demeanor—the juror did not smile at the prosecutor although he smiled at the defense. Obviously, the record does not reflect demeanor, and the trial court did not specifically comment on it. But defense counsel did not dispute this reason. "[T]he prosecutor's demeanor observations, even if not explicitly confirmed by the record, are a permissible race-neutral ground for peremptory excusal, especially when they were not disputed in the trial court." (*People v. Mai* (2013) 57 Cal.4th 986, 1052.)

Finally, as the prosecutor correctly stated, the juror said he believed life without the possibility of parole to be a worse punishment than death. He reiterated that view when the prosecutor asked him about it on voir dire. This is another legitimate race-neutral reason to exercise a peremptory challenge. (*People v. Davis* (2009) 46 Cal.4th 539, 584.) Standing alone, it might also be considered

28

a weak reason, especially given the concerns we have expressed. But, in combination with the other reasons, it is legitimate.

Although some of the reasons, in isolation, might not be very convincing, as a whole they support the trial court's ruling. Three are especially strong: the juror's distrust of police (if the prosecutor misremembered) or prosecutors (if the prosecutor misspoke), the juror's close and daily professional relationship with lawyers and the court system, and the juror's false arrest.

Defendant and the dissent argue the prosecutor did not ask the juror about some of her concerns. This factor is relevant but not particularly probative. "A party is not required to examine a prospective juror about every aspect that might cause concern before it may exercise a peremptory challenge." (*People v. Jones*, *supra*, 51 Cal.4th at p. 363.) The prosecutor did question the juror about some, although not all, of her concerns. Moreover, she had a lengthy and detailed questionnaire to review, and she heard questioning during voir dire by the court and defense counsel. "Under these circumstances, we place little weight on the prosecutor's failure to individually or more thoroughly question a prospective juror before exercising a peremptory challenge." (*People v. Dement* (2011) 53 Cal.4th 1, 21; accord, *People v. Melendez*, *supra*, 2 Cal.5th at p. 19.)

Defendant also engages in comparative juror analysis regarding this juror. The analysis does not aid him. Some unexcused jurors shared some of the traits the prosecutor cited regarding Frank G., including not wishing to sit on the jury and believing life without the possibility of parole is worse than death. But parties with limited peremptory challenges generally cannot excuse every potential juror who has any trait that is at all problematic. They must instead excuse those they believe will be most problematic under all the circumstances. There will always be some similarities between excused jurors and nonexcused jurors. Defendant cites no unexcused juror who exhibited the cynicism about prosecutors that this

29

juror showed, or who had been mistakenly arrested for a crime and remained ambivalent about it, or who had such close and continual professional contacts with attorneys and the court system that this juror had. Unlike jurors defendant cites, this juror did not simply have casual or occasional contact with attorneys. Although not a lawyer, he *supervised* civil litigation for a large corporation. Contrary to the views expressed in the dissent, all of these circumstances sharply distinguish this juror from others the dissent and defendant cite as supposedly similar. (Dis. opn., *post*, at pp. 9-10.)

As defendant and the dissent note, in some respects, Frank G. appeared to be a fine juror for the prosecution. He was a stable family man with a responsible job, had served in the Air Force, and favored the death penalty. But the question is not whether a prosecutor should or should not have excused a prospective juror. It is whether this prosecutor excused him for an improper reason. The record provides no sufficient reason to so conclude or for this court to overturn the trial court's ruling regarding Frank G.

### b. *Selecting the Alternate Jurors*

The prosecutor stated five reasons for challenging Darin B.: (1) "He is currently on probation for driving under the influence. . . . [T]he fact that he is currently on probation, I think it's highly unusual that a prosecutor would keep somebody that's currently on probation for a criminal offense on a jury, let alone a death case"; (2) "He was also roughed up by the police, for no reason at all, according to his questionnaire"; (3) "He also feels that mental defects may alter intent, thus making death unwarranted and LWOP would suffice. That's question 219"; (4) "He also had great concerns about whether or not it was fair to make those with little money, while they were on death row, and later found not guilty— I think we talked about that with him . . . "; and (5) "He's an attorney, and I don't

30

normally keep attorneys on my panel. I think they have too many problems in the jury."

The record supports each of these reasons, they are plausible, and, collectively at least, are strong. Lawyers and those currently on probation are often excused peremptorily. The prosecutor questioned the juror about most of these concerns, although not all.

Defendant engages in comparative juror analysis, but it does not aid him. He identifies no unexcused juror who was currently on probation, a point the prosecutor stressed, or was a lawyer. Defendant cites primarily one actual juror as supposedly similar to Darin B. That juror stated on the questionnaire that he had never been a defendant in a court proceeding and left blank the question of whether he had ever been arrested. But on the question of whether he had ever visited or been inside a jail, he said "yes," and designated "self" as the person he visited and the charge as "drunk driving." From this, defendant infers the juror must have been convicted of drunk driving, and he compares the prosecutor's failure to challenge that juror with the challenge of Darin B. The questionnaire was unclear. The actual juror said he had never been a defendant and did not mention a drunk driving charge under his arrest history. But even if we assume he had once been convicted of drunk driving, there is no indication that he was currently on probation.

The prosecutor stated three reasons for challenging Marion H.: (1) The "juror watches CSI, Crime Scene Investigation, all the time; she underlined that on her jury questionnaire. This case, as we have indicated to the court, does involve DNA, a substantial amount of DNA"; (2) "Some of the questions that I asked her just a few minutes ago concerning being a jailer, she indicated that it was dark and she didn't want to be involved with these type of people. I feel that she has some special knowledge with regards to what it would be like to be in jail, and that may

31

play a part in her decision making process.  I did not want someone . . . with that frame of mind, i.e., that it's dark to be in jail, to be on this particular panel"; and (3) "She indicated that she finds it difficult to judge another," and "that she did not want to be on this panel, it would be extremely hard for her to put someone to death, and it is a sad case, on question number 231."

The record supports each of these reasons.  For example, on the questionnaire, the juror indicated that her religion was very important to her, and on voir dire, in response to a question by the prosecutor, she agreed that her difficulty in judging another person was "based on religious or philosophical or moral reasons."  The prosecutor also questioned this juror about some of these concerns, although, again, not all.  These reasons are also plausible, although collectively probably not as strong as the reasons for the other two challenges at issue.  In particular, a prosecutor can legitimately be concerned about a person whose religion is very important to her, and who finds it difficult to judge another due to religious, philosophical, or moral reasons.  Defendant also engages in comparative juror analysis but, again, fails to identify any nonexcused juror who was at all similar.

Additionally, the prosecutor twice passed the alternates with Marion H. still sitting.  Although this circumstance, like others, is not dispositive, it strongly suggests that her later challenge of this juror was not based on race.  (*People v. Gutierrez, supra*, 2 Cal.5th at p. 1170.)

In a point not briefed by either party, the dissent finds pernicious that, in deciding how to exercise her final peremptory challenge while selecting the alternate jurors, the prosecutor questioned an African-American juror extensively, while she questioned a White juror only briefly.  (Dis. opn., *post*, at pp. 20-21.) But the African-American juror, who became the fourth alternate, happened to be a particularly interesting juror for reasons entirely unrelated to her race.  Among

other things, she stated on the questionnaire that her husband was a "ret. Judge atty," and that she had worked in her husband's law office. She also disclosed that her "husband's cousin's wife shot & killed him." Obviously, and reasonably, interested in these answers, the prosecutor asked her a series of questions about them.

It is true that the prosecutor questioned the White juror only briefly, mainly about her brother's past conviction. But that juror's questionnaire answers indicated little that would raise questions for a prosecutor. She had no connection to the legal profession. The dissent suggests the prosecutor should have questioned the juror about her spouse's conviction in addition to asking her about her brother's, and about a car theft. (Dis. opn., *post*, at p. 21.) But that is micromanaging. The juror said her brother's conviction would not affect her decisionmaking. Given the rest of the juror's rather unremarkable questionnaire, the prosecutor might reasonably have been satisfied with that answer. The two jurors were very different. We see nothing invidious in the different ways the prosecutor questioned them.

The prosecutor's exercise of peremptory challenges while selecting the alternates provides no reason to be skeptical of the genuineness of her reasons for excusing Frank G. The record supports the trial court's denial of defendant's *Batson*/*Wheeler* motion. We see no error.

### III.  GUILT PHASE ISSUES

### A.  Exclusion of Victim's Toxicology Report

Defendant contends the trial court erred by excluding Sigler's postmortem toxicology report during the guilt phase. He argues that it was disputed whether Sigler had called him and his cohorts "niggers," thereby provoking them to attack

her, and that the toxicology report would tend to explain why Sigler might have used a racial slur. We see no abuse of discretion.

### 1. Background

Defense counsel sought to admit Sigler's toxicology report at the guilt phase. According to the autopsy, Sigler's blood contained 0.73 micrograms of methamphetamine per milliliter and 0.22 micrograms of alcohol per milliliter. He sought to introduce the report to help make credible defendant's statement that Sigler yelled a racial slur that led to the subsequent events. Specifically, he argued the report would help explain why a small White woman would have shouted a racial slur at three African-American men late at night. Counsel also argued that the report helped to corroborate defendant's confession, including portions of the confession favorable to the defense. The prosecutor objected to the report as irrelevant on the question of guilt.

The trial court excluded the report during the guilt phase. It found that whether "she appeared to be under the influence of drugs, or alcohol, or both . . . adds so little to the bolstering or corroborating of his confession, compared to the amount of time that we will spend even right here out of the presence of the jury, haggling over whether it should come in at the guilt phase, it's not relevant at the guilt phase, and there's just too much of a problem with having the jury consider it for guilt, which it's not relevant for us to introduce it."

Evidence regarding the level of methamphetamine and alcohol in the victim's blood was admitted by stipulation during the penalty phase, and the expert witness testified about the meaning of the numbers.

### 2. Analysis

"No evidence is admissible except relevant evidence." (Evid. Code, § 350.) "Relevant evidence is evidence 'having any tendency in reason to prove or

34

disprove any disputed fact that is of consequence to the determination of the action.' " (*People v. Scott* (2011) 52 Cal.4th 452, 490, quoting Evid. Code, § 210.) "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) "In general, the trial court is vested with wide discretion in determining relevance and in weighing the prejudicial effect of proffered evidence against its probative value. Its rulings will not be overturned on appeal absent an abuse of that discretion." (*People v. Edwards* (1991) 54 Cal.3d 787, 817.)

Here, the prosecution never argued that Sigler did not yell a racial slur; indeed, she said during her opening statement that the jury would "hear testimony or evidence that [Sigler] made some racial remarks, and that the defendant and his companions approached her as a result of these." This left defense counsel free to argue that the attack was provoked by the racial epithets—as, in fact, he did. Even assuming the report had some relevance at the guilt phase, the trial court acted within its discretion in excluding it. Under the circumstances, the court could reasonably conclude that whether Sigler used a racial slur had little probative value regarding guilt and risked sidetracking the trial. The evidence was more relevant regarding penalty. It was admitted at the penalty phase. We see no abuse of discretion in the court's admitting the evidence at the penalty phase but not the guilt phase.

## B. Medical Examiner's Testimony

Defendant contends the trial court erred when it allowed Dr. Raffi Djabourian, a deputy medical examiner, to testify about aspects of Sigler's autopsy that he did not himself perform. He argues that this testimony was

35

inadmissible hearsay, and violated his Sixth Amendment right to confront witnesses under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) and subsequent cases. We see no error.

Dr. Djabourian testified that during the autopsy he removed a "splinter-type" object that was "well imbedded" in Sigler's vaginal tissue. That splinter was marked as Exhibit 8. Also included in Exhibit 8 was another, larger splinter, but the witness could not say where that splinter was found or whether he recovered it himself. When asked if due to the "location of the splinters, way inside the vaginal area, would that have been painful?" Djabourian replied, "Yes." He also testified that, in his opinion, the injuries to her vagina occurred before the fatal injuries to her head.

Preliminarily, the Attorney General urges us to find defendant's claim forfeited for failure to object at trial. "But because defendant's trial occurred before the decision in *Crawford*, he has not forfeited his *Crawford* challenge." (*People v. Clark* (2016) 63 Cal.4th 522, 563.) We thus proceed to the merits.

We have explained that, under *Crawford*, *supra*, 541 U.S. 36, "[t]he prosecution may not use '[t]estimonial statements' of a witness who does not appear at trial, unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination." (*People v. Dungo* (2012) 55 Cal.4th 608, 616.)

We need not decide whether anything in Exhibit 8 was testimonial because Dr. Djabourian never gave any specific testimony concerning the second splinter. He testified about his own discovery of a small, two-millimeter splinter found approximately four inches into Sigler's vagina. When asked to identify the second, larger splinter also included in Exhibit 8, he explained that he was "unable to determine" from where that splinter was recovered. He never testified that the second splinter was found in Sigler's vaginal tissue. Moreover, the prosecution

36

mentioned only one splinter during closing arguments. It never relied on the existence of a splinter other than the one Dr. Djabourian found himself. Accordingly, no error occurred.

### C. Sufficiency of the Evidence of the Felony-Based Special Circumstances

Defendant contends the evidence was insufficient to support the special circumstance findings that he committed the murder in the commission of robbery, kidnapping for rape, rape, and sexual penetration by a foreign object. Specifically, he argues the evidence was insufficient to prove that he had a felonious purpose independent of the murder under the rule established in *People v. Green* (1980) 27 Cal.3d 1 (*Green*). We disagree.

"To determine whether sufficient evidence supports a jury verdict, a reviewing court reviews the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable jury could find the defendant guilty beyond a reasonable doubt." (*People v. Rountree* (2013) 56 Cal.4th 823, 852-853.) "This standard of review applies when the evidence is largely circumstantial and to review of special circumstance findings." (*People v. Johnson* (2015) 60 Cal.4th 966, 988.)

In *Green*, the defendant "took his victim's clothing for the purpose of burning it later to prevent identification." (*Green*, *supra*, 27 Cal.3d at p. 61.) Although this conduct "technically" constituted robbery (*ibid*.), we said it "was not in fact a murder in the commission of a robbery but the exact opposite, a robbery in the commission of a murder." (*Id*. at p. 60.) We held that the robbery special circumstance did not apply "when the defendant's intent is not to steal but to kill and the robbery is merely incidental to the murder . . . because its *sole* object is to facilitate or conceal the primary crime." (*Id*. at p. 61, italics added.)

37

The *Green* rule applies to this 1998 crime, although the law has since changed. (*People v. Brents* (2012) 53 Cal.4th 599, 608-609, fn. 4.) "At the time of defendant's offense, this special circumstance required an independent felonious purpose to commit one of the listed felonies (in this case, kidnapping). In other words, the kidnapping could not be merely incidental to the murder, with the murder being the defendant's primary purpose. [Citations.] We have, however, found sufficient evidence to support this special circumstance so long as there was a concurrent purpose to commit both the murder and one of the listed felonies." (*Id.* at pp. 608-609, fn. omitted.) The question is "whether the defendant had a 'purpose for the kidnapping apart from murder.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 63, quoting *People v. Raley* (1992) 2 Cal.4th 870, 902.) "It is only when the underlying felony is merely incidental to the murder that the felony-murder special circumstance does not apply." (*People v. Bolden* (2002) 29 Cal.4th 515, 554.)

This case is not remotely like *Green*, *supra*, 27 Cal.3d 1. The evidence was ample for the jury to find that defendant had multiple felonious purposes apart from the murder: to rob, to kidnap for rape, to rape, and to commit sexual penetration by a foreign object. From defendant's recall of the series of events, the jury could infer that the crimes were committed in successive fashion that eventually led to an intent to kill and the eventual murder. But even if defendant had formed the intent to kill Sigler at the outset, that alone would not remove the possibility that he also formed the independent, if also concurrent, intent to commit the other crimes. "But even if a defendant harbored the intent to kill at the outset, a concurrent intent to commit an eligible felony will support the special circumstance allegation." (*People v. Davis*, *supra*, 46 Cal.4th at p. 609.)

The victim was moved to the embankment before being raped, from which the jury could infer that defendant and his codefendants kidnapped her with the

38

intent to rape in addition to the intent to kill. The medical examiner testified that Sigler's injuries indicated that she was raped with the stick while she was still alive; the jury could therefore have concluded that the rape was committed for sexual gratification rather than just to kill. The jury was not compelled to find that these crimes were solely incidental to the murder. One does not have to commit all, or even any, of them to kill; none of them helped conceal the perpetrators' identity or otherwise facilitated the murder. The evidence was ample that defendant committed the other felonies for independent felonious purposes.

### D. Sufficiency of the Evidence of Robbery and Robbery Special Circumstance

Defendant contends the evidence was insufficient to support the robbery conviction or the robbery special-circumstance finding.

"Robbery is 'the felonious taking of personal property in the possession of another . . . and against [the person's] will, accomplished by means of force or fear.' (§ 211.) If a defendant does not harbor the intent to take another's property at the time the force or fear is applied, the taking is a theft, not a robbery." (*People v. Harris* (2013) 57 Cal.4th 804, 851.) Defendant contends the evidence was insufficient to permit the jury to find that (1) defendant intended to steal before using force or fear, (2) the force or fear was greater than the minimum required merely to take the property, and (3) the taking occurred while the victim was still alive. We disagree.

Evidence was presented that Sigler had been given food stamps, that an empty food stamp booklet was found at the scene of the crime, and that food stamps bearing that serial number were used at a nearby market. The owner of the market testified that defendant used food stamps to purchase items around that time. This evidence was sufficient to support the conclusion that defendant took

39

the victim's food stamps and used them. This conclusion, in turn, supported the robbery finding.

"Where a person is left dead or dying in 'relative proximity' to property that was taken, and such property is later found in the defendant's possession, the jury is entitled to infer that the victim was robbed and that the defendant committed the crime." (*People v. DePriest* (2007) 42 Cal.4th 1, 47.) " '[W]hen one kills another and takes substantial property from the victim, it is ordinarily reasonable to presume the killing was for purposes of robbery.' [Citation.] And, significantly, we have observed that '[i]f a person commits a murder, *and after doing so takes the victim's wallet*, the jury may reasonably infer that the murder was committed for the purpose of obtaining the wallet, because murders are commonly committed to obtain money.' " (*People v. Hughes* (2002) 27 Cal.4th 287, 357.) The jury could reasonably infer that defendant and his cohorts intended to rob Sigler from the beginning of the encounter, or at least before or during the application of force or fear.

### E.   Instructional Issues

Defendant contends the trial court committed several instructional errors. A reviewing court may review an instruction even absent an objection "if the substantial rights of the defendant were affected thereby." (§ 1259.) However, "[a] party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503.) Except as specifically indicated, we find the contentions cognizable, for the asserted error would generally have affected defendant's substantial rights.

### 1. *Instruction on Felony Murder*

The court instructed the jury on four theories of murder: deliberate and pre-meditated, felony murder, torture murder, and aiding and abetting. It also instructed that the jury need not agree on any one theory of guilt. For felony murder, the court instructed the jury pursuant to CALJIC No. 8.21 as adapted to the case: "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs during the commission of any of the following crimes: robbery, kidnap for rape, rape in concert, rape, sexual penetration by a foreign object in concert, sexual penetration by a foreign object or torture, is murder of the first degree when the perpetrator had the specific intent to commit that crime. The specific intent to commit any of the following crimes: robbery, kidnap for rape, rape in concert, rape, sexual penetration by a foreign object (a wooden stake) in concert, sexual penetration by a foreign object (a wooden stake) or torture and the commission of any such crime must be proved beyond a reasonable doubt."

Defendant argues that the "pattern instruction appears to have contemplated use in the situation of a single section 189 felony. Its use was error when multiple section 189 felonies were alleged because it permitted jurors to find [defendant] guilty of murder, if jurors found the killing occurred during one listed felony, and defendant had the specific intent to commit *another*, unrelated listed felony." For example, he argues that a juror might have found him guilty of murder if he or she believed the killing occurred during a rape but that defendant had only the intent to rob. If any juror relied on this improper instruction, he argues, then his murder conviction must be overturned.

We disagree. In *People v. Kelly* (2007) 42 Cal.4th 763, we rejected a similar claim where robbery and rape were listed as the predicate felonies. "[R]eading the entire instruction in context, including the last portion of the first

41

sentence ('when the perpetrator had the specific intent to commit such crime') and the second sentence, informing the jury that the 'specific intent to commit rape and/or robbery . . . must be proved beyond a reasonable doubt,' we see no reasonable likelihood the jury would parse the instruction in a way that did not require the intent to commit the underlying felony." (*Id.* at p. 791.)

The same is true here. The instruction did not allow the jury to impermissibly link the commission of one felony with the intent to commit a different felony. The instruction states that the "unlawful killing of a human being . . . which occurs during the commission of any of the following crimes . . . is murder in the first degree when the perpetrator had the specific intent to commit *that* crime." (Italics added.)

### 2. *Instruction on Aiding and Abetting*

Defendant contends the court incorrectly instructed the jury on an aider and abettor's liability for unintended crimes. "[A] defendant may be held criminally responsible as an accomplice not only for the crime he or she intended to aid and abet (the target crime), but also for any other crime [nontarget crime] that is the 'natural and probable consequence' of the target crime." (*People v. Prettyman* (1996) 14 Cal.4th 248, 261.) To find an aider and abettor guilty of a nontarget crime under the natural and probable consequences theory, the jury must find that the defendant aided and abetted the target crime, that a coparticipant in the target crime also committed a nontarget crime, and that this nontarget crime was a natural and probable consequence of the target crime the defendant aided and abetted. (*Id.* at p. 262.)

If a prosecutor does not rely on the natural and probable consequences theory, the court need not instruct on the doctrine. (*People v. Prettyman*, *supra*, 14 Cal.4th at p. 270.) But if a court does instruct on it, the "court should identify

42

and describe the target or predicate crime that the defendant may have aided and abetted." (*Id*. at p. 268.) However, a defendant cannot be found guilty of first degree murder under the natural and probable consequences theory of accomplice liability. (*People v. Chiu* (2014) 59 Cal.4th 155, 166.)

The court instructed on the natural and probable consequences doctrine with a modified version of CALJIC No. 3.02. As relevant to defendant's contention, the court instructed as follows: "One who aids and abets another in the commission of a crime or crimes is not only guilty of that crime or those crimes, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crimes originally aided and abetted.

"In order to find the defendant guilty of any one of the following crimes of murder, or robbery, or kidnap for rape, or rape in concert, or rape, or sexual penetration rape by a foreign object (a wooden stake) in concert, or sexual penetration rape by a foreign object (a wooden stake) . . . , you must be satisfied beyond a reasonable doubt that: 1. The crime or any of the following crimes of: murder, or robbery, or kidnap for rape, or rape in concert, or rape, or sexual penetration rape by a foreign object (a wooden stake) in concert, or sexual penetration rape by a foreign object (a wooden stake), were committed; 2. That the defendant aided or abetted any one of those crimes; 3. That a co-principal in that crime committed any one of the following crimes: murder, or robbery, or kidnap for rape, or rape in concert, or rape, or sexual penetration rape by a foreign object (a wooden stake) in concert, or sexual penetration rape by a foreign object (a wooden stake); and 4. That any one of the following crimes: murder, or robbery, or kidnap for rape, or rape in concert, or rape, or sexual penetration rape by a foreign object (a wooden stake) in concert, or sexual penetration rape by a foreign object (a wooden stake) were a natural and probable consequence of the commission of any one of the crimes of robbery, or kidnap for rape, or rape in

concert, or rape, or sexual penetration rape by a foreign object (a wooden stake) in concert, or sexual penetration rape by a foreign object (a wooden stake).

"You are not required to unanimously agree as to which originally contemplated crime the defendant aided and abetted, so long as you are satisfied, beyond a reasonable doubt, and unanimously agree that the defendant aided and abetted the commission of any one of the identified and defined target crimes of murder, or robbery, or kidnap for rape, or rape in concert, or rape, or sexual penetration rape by a foreign object (a wooden stake) in concert, or sexual penetration rape by a foreign object (a wooden stake), and that any one of those crimes were a natural and probable consequence of the commission of any of the target crimes."

Defendant contends these instructions incorrectly allowed the jury to find him guilty on each count without requiring any natural and probable consequence connection between the offense he was alleged to have aided and abetted (target offense) and the offense committed by one of his cohorts (nontarget offense). He argues that while the instruction would have been correct if he had been accused of only one target offense and one nontarget offense, the modified version of the instruction impermissibly allowed a "mixing and matching" of target and nontarget offenses.

We disagree. We "reject[ed] any challenge to the adequacy of CALJIC No. 3.02's explication of the natural and probable consequences doctrine." (*People v. Richardson* (2008) 43 Cal.4th 959, 1022.) The instruction cannot reasonably be interpreted the way defendant claims. It began by telling the jury an aider and abettor is "guilty of any other crime committed by a principal which is a natural and probable consequence of *the* crimes originally aided and abetted." (Italics added.) In other words, the jury was instructed that the nontarget crime must be a

natural and probable consequence of "the" crime or crimes aided or abetted, which states the law precisely.

However, to the extent it permitted a first degree murder conviction based on the natural and probable consequences doctrine, the instruction was erroneous under our later decision in *Chiu*, where we held that an aider and abettor in one crime cannot be held liable for first degree murder under a natural and probable consequences theory. (*People v. Chiu*, *supra*, 59 Cal.4th at p. 166.) The error was harmless. The record shows the jury necessarily relied on at least one valid theory of first degree murder: felony murder. By finding the felony-based special circumstance allegations true, the jury necessarily found defendant committed all four of the special circumstance crimes. Thus, it made all the necessary findings to find defendant guilty of first degree felony murder, with robbery, kidnapping for rape, rape, and sexual penetration by foreign object as the underlying felonies. These findings made the error under *Chiu* harmless beyond a reasonable doubt. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 902, fn. 26.)

### 3. *Form of Guilt Verdict*

Defendant contends the verdict form for the murder count "fails to reflect with any certainty that the jury convicted [him] of first degree murder on a valid legal theory." He argues the form made it appear the jury could convict him of first degree murder if it found he merely acted in reckless disregard for human life. We disagree. The *instructions* the jury received informed it of its duty. The verdict form was merely the means for it to register its verdict.

The verdict form for the murder count required the jury to indicate whether it found defendant guilty of murder in the first or second degree. The jury indicated first degree. The jury next was required to decide whether defendant was either "A. The Actual Killer; or [¶] B. An Aider and Abettor and had the

45

intent to kill or was a Major Participant and acted with Reckless indifference to human life." It indicated choice B. The jury then was required to answer "true" or "not true" to each of the special circumstance allegations for robbery, kidnapping for rape, rape, rape by a foreign object, and torture. The jury indicated "true" for each allegation.

Defendant argues that this form was a "hybrid" general verdict and special verdict. "The jury must render a general verdict, except that in a felony case, when they are in doubt as to the legal effect of the facts proved, they may. . . find a special verdict." (§ 1150.) "A special verdict is that by which the jury find the facts only, leaving the judgment to the Court. It must present the conclusions of fact as established by the evidence, and not the evidence to prove them, and these conclusions of fact must be so presented as that nothing remains to the Court but to draw conclusions of law upon them." (§ 1152; see *People v. Webster* (1991) 54 Cal.3d 411, 446-447.) Defendant contends that the verdict form was a hybrid because it contained both the verdict of guilt under a general verdict and findings of fact without a judgment of guilt.

We disagree. Each of the findings on the form had legal significance. The jury found defendant guilty of first degree murder. Then it found he was a major participant and acted with reckless disregard for life, a prerequisite for the felony-based special circumstances. (§ 190.2, subd. (d).) Then it found each of the special circumstance allegations true. The jury did not merely find facts and leave the judgment to the court. It stated its conclusions of law: Defendant was guilty of first degree murder committed under the specified special circumstances.

Moreover, special verdicts are permissible "so long as they do not interfere with the jury's deliberative process." (*People v. Webster*, *supra*, 54 Cal.3d at p. 447.) Defendant argues that the jury could have been confused about the "A" and "B" choices, and applied them to its determination that defendant was guilty of

46

first degree murder rather than only applying the choices to the special circumstance allegations. He argues that "[t]he trial court did not instruct the jury that it should select Options A or B only if, and after, the jury had already independently found that [he] was guilty of first degree murder."

On the contrary, the court instructed the jury: "*If* you find the defendant in this case guilty of murder in the first degree, you must *then* determine if one or more of the following special circumstances are true or not true . . . ." (Italics added; see CALJIC No. 8.80.1.) Thus, the court explained the proper order by which the jury needed to make its findings. The verdict form merely provided the jury the means to state its findings; it did not purport to contain full instructions.

### 4. *Instruction on Specific Intent*

Defendant argues the trial court did not properly instruct the jury that torture and aiding and abetting require specific intent. Aiding and abetting liability and torture both require a specific intent. Torture requires "the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose . . . ." (§ 206; see *People v. Pearson*, *supra*, 53 Cal.4th at pp. 320-321; *People v. Massie* (2006) 142 Cal.App.4th 365, 370-371.) Aiding and abetting liability requires "the intent or purpose of committing, encouraging, or facilitating the commission of the offense." (*People v. Beeman* (1984) 35 Cal.3d 547, 561; accord, *People v. Mendoza* (1998) 18 Cal.4th 1114, 1123.) As we explain, the court instructed the jury correctly regarding aiding and abetting. It also gave a correct instruction regarding torture, but inconsistently also included torture among the listed general intent crimes and not among the listed specific intent crimes. Viewing the instructions as a whole we find the inconsistency could not have misled the jury.

47

Regarding aiding and abetting, the court gave the standard instruction as follows: "A person aids and abets the commission of a crime when he, 1. with knowledge of the unlawful purpose of the perpetrator; and 2. with the *intent or purpose* of committing or encouraging or facilitating the commission of a crime; and 3. by act or advice aids, promotes, encourages, or instigates the commission of the crime." (Italics added; see CALJIC No. 3.01.)

Defendant focuses on the language "intent or purpose" and argues that the jury could have understood "purpose" as "something different from, and less than," the required specific intent. However, we used that same language in both *People v. Beeman*, *supra*, 35 Cal.3d at page 561, and *People v. Mendoza*, *supra*, 18 Cal.4th at page 1123. If anything, "purpose" is a higher standard than "intent." (See *Cel-Tech Communications*, *Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 172-173.) The court did not err in using the language we have used to describe the required mental state for aiders and abettors.

When the court defined the crime of torture, it correctly instructed pursuant to CALJIC No. 9.90 that the jury had to find that defendant "inflicted great bodily injury upon the person of another," and that he "did so with specific intent to cause cruel or extreme pain and suffering . . . ." Similarly, it instructed that in order to find the torture special circumstance true, the jury had to find that "[t]he murder was intentional" and "defendant intended to inflict extreme cruel physical pain and suffering upon a living human being . . . ."

However, the court listed torture among the crimes for which, "unless otherwise instructed," the jury had to find "a union or joint operation of act or conduct and general criminal intent." It also gave two instructions concerning specific intent crimes in which it failed to list torture among those crimes. First it gave a modified version of CALJIC No. 2.02, telling the jury it could not convict of murder, robbery, or kidnap for rape, or find the allegations under section 667.61

48

(enhancement allegations involving torture) to be true, "unless the proved circumstances are not only (1) consistent with the theory that the defendant had the required specific intent or mental state, but (2) cannot be reconciled with any other rational conclusion." Second, it gave a modified version of CALJIC No. 3.31, which told the jury that for the crimes of murder, robbery, and kidnap for rape, "there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator. Unless this specific intent exists, the crimes or allegations to which it relates is not committed or is not true. The specific intent required is included in the definition of the crimes or allegations set forth elsewhere in these instructions."

Defendant is correct that the trial court should not have included torture among the general intent crimes rather than among the crimes requiring specific intent. Doing so contained the negative implication that torture is not a specific intent crime. But the omission could not have misled the jury. The court stated that general intent instruction applied "unless otherwise instructed." When it specifically defined torture, it correctly instructed that torture was a specific intent crime. It also correctly instructed that the torture special circumstance required specific intent. Additionally, the prosecutor herself stated to the jury multiple times that she had to prove defendant had the specific intent to inflict the pain. Viewing the instructions as a whole, together with the prosecutor's argument, it is not reasonably likely the jury understood the instructions as permitting it to find defendant guilty of torture without finding the requisite specific intent. (*People v. Kelly*, *supra*, 42 Cal.4th at p. 790.) Moreover, because the jury, properly instructed, found the torture special circumstance true, it clearly found the requisite specific intent, thus making any error harmless.

49

### 5. *Torture Felony-Murder Instruction*

The trial court included torture as a possible predicate felony for first degree murder under a felony-murder theory. "[T]his was error, as torture in violation of section 206 was not added to section 189's list of predicate felonies for first degree murder until 1999, after Sigler's murder." (*People v. Pearson*, *supra*, 53 Cal.4th at p. 319.)

But the error was harmless for the reasons the same error was harmless in *Pearson*. The jury found true special circumstance allegations that defendant murdered Sigler in the commission of robbery, kidnapping for rape, rape, and foreign object rape. "Because a killing in commission of any of these offenses constitutes first degree murder under section 189, it follows the jury must unanimously have found defendant guilty of first degree murder on the valid theory the killing occurred during the commission of these felonies. [Citations.] The erroneous instruction thus did not affect the verdict and was, on any standard of prejudice, harmless." (*People v. Pearson*, *supra*, 53 Cal.4th at p. 320.)

Defendant seeks to distinguish *Pearson* based on some of his earlier arguments of other instructional error. Because we have rejected those arguments, we reject this one also.

### 6. *Failure to Instruct on Lesser Included Offense of Theft*

Regarding the robbery count, the court did not instruct the jury on theft as a lesser included offense of robbery. Defendant argues the evidence did not establish whether he had formed the intent to take Sigler's food stamps before or after he used force on her. If after, he would be guilty only of theft, not robbery. (See *Green*, *supra*, 27 Cal.3d at pp. 53–54.)

A trial court has an independent obligation to instruct the jury on all lesser included offenses the evidence warrants, even against the defense's wishes. Such instructions are required when, but only when, a jury could reasonably conclude

50

that the defendant committed the lesser offense but not the greater one. (*People v. Breverman* (1998) 19 Cal.4th 142, 161-162.)

We need not decide whether there was substantial evidence of only theft in this case, because defendant invited any error. When the court and parties discussed the instructions to be given, the trial court asked if either side thought "there were any lesser includeds that were appropriate." Defense counsel responded, "I didn't ask for any." The prosecutor then asked defense counsel, "And are you not asking for any as a result of tactical reasons?" Defense counsel responded, "Yes."

"[A] defendant may not invoke a trial court's failure to instruct on a lesser included offense as a basis on which to reverse a conviction when, for tactical reasons, the defendant persuades a trial court not to instruct on a lesser included offense supported by the evidence. [Citations.] In that situation, the doctrine of invited error bars the defendant from challenging on appeal the trial court's failure to give the instruction." (*People v. Barton* (1995) 12 Cal.4th 186, 198; accord, *People v. Horning* (2004) 34 Cal.4th 871, 905.) Defense counsel said that she was not requesting instructions on lesser included offenses for tactical reasons. Accordingly, the record "shows that defendant's 'lack of objection to the proposed instruction was more than mere unconsidered acquiescence.' " (*Horning*, at p. 905.)

Defense counsel did not specifically state what her tactical reasons were, but we have never required such a statement. In this case, it is easy to infer what counsel's tactical reasons might have been. Persuading the jury that defendant committed only theft because he took the food stamps after the victim had become unconscious would provide defendant with little practical benefit, considering the number of remaining serious charges and special circumstance allegations. But

51

doing so would force the jury to focus on the circumstance that defendant was involved in the assault to the end, a focus that could only be detrimental to him.

### 7. *Failure to Instruct on Provocation as It Relates to First Degree Murder*

Defendant contends the court should have instructed the jury on provocation as it relates to first degree murder. (See CALJIC No. 8.73.) He argues that Sigler provoked him, Pearson, and Armstrong by calling them "niggers," and that this provocation negated deliberation and premeditation, thereby making the killings at most second-degree murder.

Defendant forfeited this claim by not requesting additional instruction on provocation at trial. Instructions on provocation are pinpoint instructions that need not be given sua sponte but only on request. (*People v. Rogers* (2006) 39 Cal.4th 826, 878-879.)

Moreover, we see no error. The court instructed, "If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and *not under a sudden heat of passion* or other condition precluding the idea of deliberation, it is murder of the first degree." (Italics added; see CALJIC No. 8.20.) The italicized language gave defendant the full opportunity to argue to the jury, and for the jury to consider, that Sigler's provocative words made him act in a sudden heat of passion negating deliberation and premeditation.

Additionally, any error would have been harmless. The court instructed the jury on felony murder as another theory of first degree murder. By finding true the special circumstance allegations that the murder involved robbery, kidnapping for rape, rape, and rape by a foreign object, the jury necessarily found that Sigler's murder was first degree murder under a felony-murder theory. The failure to

52

instruct on provocation "was therefore harmless, as the jury necessarily determined the killing was first degree murder . . . under other properly given instructions." (*People v. Demetrulias* (2006) 39 Cal.4th 1, 25.)

### 8. *Defining "Asportation"*

Defendant contends the trial court erroneously instructed the jury on the asportation element of kidnapping because it allowed the jury to consider factors other than distance. "At the time of the crime here, there existed two distinct standards of asportation for kidnapping, depending on whether the kidnapping was for robbery (aggravated kidnapping) under section 209, subdivision (b) . . . , or was a simple kidnapping under section 207[, subdivision ](a)." (*People v. Rayford* (1994) 9 Cal.4th 1, 11-12, fn. omitted.) The rule for aggravated kidnapping is that the movement must not be "merely incidental to the commission of the robbery, and [must] substantially increase[] the risk of harm over and above that necessarily present in the crime of robbery itself." (*Id*. at p. 12.) This rule applies to other forms of aggravated kidnapping, including kidnapping for rape. (*Id*. at p. 14.)

By contrast, asportation for purposes of simple kidnapping used to be exclusively based on distance. (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1319.) We changed the rule for simple kidnapping in *People v. Martinez* (1999) 20 Cal.4th 225 to make it similar to the rule for aggravated kidnapping, but the change cannot apply retroactively to defendant's crime. (*Id*. at pp. 238-241; *People v. Brooks*, *supra*, 3 Cal.5th at pp. 68-69.)

The court correctly instructed the jury on aggravated kidnapping. (CALJIC No. 9.54.) It also gave an instruction that erroneously indicated the jury could consider factors other than distance for simple kidnapping. (CALJIC No. 9.50.) However, the error was harmless. The jury did not return any verdict of guilty or a true finding of a special allegation that concerned simple kidnapping. All the

guilty verdicts and true findings, including the findings under section 667.61, subdivisions (a) and (d), involved the asportation standard for *aggravated* kidnapping, on which the jury was correctly instructed. (See *People v. Diaz* (2000) 78 Cal.App.4th 243, 245-247.) The jury either returned no verdict or a not true verdict regarding any special allegations that might have involved simple kidnapping.

### 9. *Using the Word "Stake"*

Defendant contends the trial court erred in using the word "stake" instead of "stick" in the guilt phase jury instructions in describing the weapon allegedly used in the crimes. He argues that doing so impermissibly favored the prosecution by repeatedly using a word that is more "offensive and brutal" than the word defendant himself used to describe the weapon. He also argues that using the word "stake" "implicitly told jurors that the prosecution had proved the weapon was a stake and it was similar to the stakes the prosecutor introduced into evidence."

Defendant was charged with several counts that alleged he used a "stake/stick" as a dangerous and deadly weapon. When discussing the jury instructions, the trial court stated, "When the instructions get to the sexual penetration by a foreign object and then you have, dash, a wooden stake, I'm thinking I'll just put 'a wooden stake' in parenthesis." The prosecutor agreed. Defense counsel did not object. In the instructions, the court used the words "wooden stake" many times to describe either the deadly weapon allegedly used in the attack, or the foreign object allegedly used in the sexual penetration counts.

Defendant does not argue that the jury instruction was legally deficient but that it was biased. "A party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first

54

requesting such clarification at trial." (*People v. Hillhouse*, *supra*, 27 Cal.4th at p. 503.) Defendant did not object to the jury instructions or to the prosecution's or witnesses' use of the term during the trial. This claim is therefore forfeited.

The claim also lacks merit. Defendant argues that the use of the word "stake" versus "stick" rendered the instructions argumentative and "invited the jury to draw inferences favorable to one of the parties from specified items of evidence." (See *People v. Earp* (1999) 20 Cal.4th 826, 886.) It did not do so. Defendant's own counsel used both terms interchangeably throughout the trial, starting with his opening statement. The parties never disputed whether the object was to be a called a "stick" or a "stake," nor was it the prosecution's burden to prove that it was a "stake" instead of a "stick." In addition, much evidence showed that the stakes admitted into evidence, although not the actual weapon used during the attack, were consistent with Sigler's injuries. Even accepting defendant's contention that "stake" is more evocative than "stick," "stake" accurately described the objects introduced at trial and is not by itself unduly offensive or shocking to the contemporary ear. We see no error in the court's use of the term "stake" rather than "stick."

### 10. *Failure to Instruct on the Independent Purpose Requirement*

The trial court did not instruct the jury on the requirement that, for the felony-based special circumstances to apply, it had to find defendant committed the felonies for an independent felonious purpose. Defendant contends the court erred in not so instructing.

The court need not give the instruction in every case in which felony-based special circumstances are alleged. "This court has recognized that the independent felonious purpose rule is not an element of the special circumstance, on which a court must instruct in every case in which a felony murder special circumstance

55

has been alleged. [Citation.] The rule 'merely clarifies the scope of the requirement that the murder must have taken place "during the commission" of a felony.' [Citations.] From this we have concluded that a trial court has no duty to instruct on the independent felonious purpose rule 'unless the evidence supports an inference that the defendant might have intended to murder the victim without having an independent intent to commit the specified felony.' [Citations.] Put in affirmative terms, a court has a duty to instruct the jury, on its own motion, that the felony cannot have been merely incidental to the murder when there is evidence from which the jury could have inferred that the defendant did not have an independent felonious purpose for committing the felony." (*People v. Brooks*, *supra*, 3 Cal.5th at pp. 117-118.)

Here, no such evidence existed. On this evidence, no reasonable jury could conclude that defendant kidnapped for rape, raped, sexually penetrated, and robbed the victim solely to facilitate the murder without any independent purpose. Indeed, defense counsel never argued to the jury that any of the felonies were merely incidental to achieving the murder. (See *People v. D'Arcy* (2010) 48 Cal.4th 257, 297.) The point was a nonissue at trial. Accordingly, we find no error.

Additionally, the jury's actual verdict shows it *did* find an independent felonious purpose. The kidnap-based special circumstance did not involve simple kidnapping but kidnapping *for rape*. Kidnapping for the purpose of rape is clearly an independent felonious purpose. Thus, any error in failing to give the instruction would have been harmless.

In *Brooks*, we found prejudicial error regarding a kidnapping-murder special circumstance in not giving the independent felonious intent instruction. (*People v. Brooks*, *supra*, 3 Cal.5th at pp. 116-120.) But that case was different. It did not contain evidence of the kidnapping for rape, of the rape, of the sexual

penetration, or of the robbery that this case contains. The question of an independent felonious intent was close in that case; it is not close in this case.

### IV. PENALTY PHASE ISSUES

#### A. Sustaining a Relevance Objection

In cross-examining one of the police officers who testified about the April 1996 incident in which defendant's son received a stab wound, defense counsel ascertained that the witness had contacted the "Department of Children Services" (the department) about the incident. Counsel then asked, "Were you aware of their determination of what happened?" The court sustained the prosecutor's objection on relevance grounds, and the question was not answered. Defendant contends the question sought relevant evidence, and it was admissible under Evidence Code section 356. He also contends that sustaining the objection violated his constitutional right to present mitigating evidence.

The Attorney General contends the claim is not cognizable. Normally, a reviewing court may not consider a claim that the trial court erroneously excluded evidence unless "[t]he substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means . . . ." (Evid. Code, § 354, subd. (a).) However, the rule does not apply when "[t]he evidence was sought by questions asked during cross-examination or recross-examination." (*Id*., subd. (c).) "Normally, if the trial court excludes evidence on cross-examination, no offer of proof is necessary to preserve the issue for consideration on appeal." (*People v. Foss* (2007) 155 Cal.App.4th 113, 127.) This exception applies only to questions within the scope of the direct examination. "If the evidence the defendant seeks to elicit on cross-examination is not within the scope of direct examination, an offer of proof is required to preserve the issue." (*Ibid*.) Here the question to which the court sustained the objection

57

was within the scope of direct examination. Accordingly, Evidence Code section 354 requires no offer of proof. The claim is cognizable.

Two recent cases from this court have found contentions that the trial court erred either by refusing to permit, or sustaining objections to, questions asked on cross-examination to be noncognizable for failure to make an offer of proof. (*People v. Capistrano* (2014) 59 Cal.4th 830, 866-867; *People v. Vines* (2011) 51 Cal.4th 830, 868-869.) *Capistrano* correctly found the claim not cognizable for another reason. The *codefendant*, not the defendant, had sought to present the evidence, and the defendant did not join the codefendant's request. (*Capistrano*, at p. 867.) But to the extent *Capistrano* and *Vines* suggest that a party must make an offer of proof to challenge on appeal a court's ruling limiting cross-examination, they are inconsistent with Evidence Code section 354, subdivision (c), and we hereby overrule them.

Turning to the merits, we see no error. "The trial court is accorded broad discretion in determining the relevance of evidence." (*People v. Lucas* (2014) 60 Cal.4th 153, 229.) The court did not abuse its discretion. We do not know what answer the question would have elicited. It appears defense counsel was expecting an answer something like that the department took no action, perhaps after an investigation. Even assuming that would have been the answer, the court acted within its discretion in finding it irrelevant. Many reasons might explain the department's failure to act. What was relevant was *evidence* that defendant either did or did not assault his child. If the department failed to act because of some evidence that defendant did not assault his child, that evidence would be relevant. Defendant was entitled to admit any such evidence. But whether a governmental agency did or did not act is irrelevant to whether defendant committed that crime. Moreover, we note that to the extent the officer would recount what the department concluded, or why, the testimony would have been hearsay.

58

Defendant also claims that the ruling violated Evidence Code section 356, which provides as relevant: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; . . . when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence." " 'The purpose of this section is to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed.' " (*People v. Melendez*, *supra*, 2 Cal.5th at p. 25.) This section does not apply here. Evidence of what the department did or did not do is not necessary to make the evidence of what occurred understood or to avoid any misleading impression on the subject.

Defendant contends that sustaining the relevance objection violated his right to present mitigating evidence in capital proceedings under *Lockett v. Ohio* (1978) 438 U.S. 586 and the California Constitution. We disagree. The court did not prevent defendant from presenting mitigating evidence. Whether and how the department acted was irrelevant to either mitigation or aggravation. "Application of the ordinary rules of evidence generally does not impermissibly infringe on a capital defendant's constitutional rights." (*People v. Kraft* (2000) 23 Cal.4th 978, 1035.) The court only precluded testimony regarding the department's action. It did not foreclose defendant from presenting other mitigating evidence, including evidence regarding the incident in question.

### B. Admitting Gang Activity Evidence on Rebuttal

The prosecution introduced evidence of defendant's involvement in gang activity during its penalty phase rebuttal.

Monte Gmur testified that defendant, Pearson, Armstrong, and another man were at Gmur's house before the assault on Sigler.  At one point during the evening, Gmur heard defendant and Pearson conversing.  "They were saying back and forth, 'You ask him.  No, you ask him.' "  Pearson then asked Gmur if they could use one of the rooms to "jump him in," meaning to initiate someone into their gang.  Gmur refused, at which point defendant and the others left the house for about twenty minutes.  When they returned, Gmur heard defendant make a phone call during which defendant said they had just initiated the other man.

Additionally, the prosecution presented evidence that, on a bus shortly after Sigler's killing, the defendants argued among themselves about Crips and Bloods and had a dispute with a fourth African-American man about gangs—specifically, about Crips, Bloods, and gang colors.

Defendant contends that this evidence was improper rebuttal evidence.  It appears to have been proper rebuttal.  (See *People v. Loker* (2008) 44 Cal.4th 691, 709.)  The defense presented evidence suggesting that the charged crimes were out of character and that defendant was a follower, not a leader.  The rebuttal evidence tended to show otherwise.  But in any event, admitting the evidence was harmless.  The defense itself introduced evidence of defendant's gang membership.  Four defense witnesses, including defendant's mother and the mother of his children, testified that defendant was a gang member and was involved in gang activity.  The rebuttal evidence did not relate any particularly violent, shocking, or inflammatory incidents.  It told the jurors little beyond what defense evidence had already told them.  There is no reasonable possibility admitting the evidence affected the verdict.  (*People v. Gonzalez* (2006) 38 Cal.4th 932, 960-961.)

### C.  Prosecutor's Alleged Use of a Different Theory at the Codefendant's Trial

Defendant and his original codefendants, Pearson and Armstrong, were tried separately.  Defendant contends that during the penalty phase of defendant's trial, the prosecutor portrayed him as a leader during the attack on Sigler, but that during the penalty phase of Pearson's later trial, the same prosecutor argued that Pearson was the leader.  He contends that this use of inconsistent theories violates due process.

Because this claim was not the subject of any proceeding in the trial court, and indeed involves events occurring after defendant's trial, it is not cognizable on appeal. "[T]he issue is better decided on a petition for writ of habeas corpus than on direct appeal, at least under the circumstances here presented.  Where, as here, the asserted inconsistencies in prosecutorial theory were not the subject of any proceeding in the trial court and, hence, neither the inconsistencies nor any explanations the prosecutor may have been able to offer appear in the appellate record, any due process claim defendant can state should be 'presented by petition for writ of habeas corpus rather than by appeal.' " (*People v. Sakarias* (2000) 22 Cal.4th 596, 635.)

### D.  Cumulative Prejudice

Defendant contends that the cumulative effect of the asserted errors requires reversal of the death judgment.  We disagree.  None of the errors we have identified was prejudicial individually, and they did not have any cumulative effect.

### E.  Challenges to California's Death Penalty Law

Defendant reiterates numerous challenges to California's death penalty law. We have repeatedly rejected these claims and continue to do so.

61

"Penal Code sections 190.2 and 190.3 are not impermissibly broad, and factor (a) of Penal Code section 190.3 does not make imposition of the death penalty arbitrary and capricious." *(People v. Sánchez* (2016) 63 Cal.4th 411, 487.) CALJIC No. 8.88, which instructs that jurors must be "persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances" to warrant a death judgment, is not unconstitutionally vague or deficient in other respects. (*People v. Landry* (2016) 2 Cal.5th 52, 122–123.) The use of adjectives like "extreme" and "substantial" in defining mitigating factors in section 190.3 does not impermissibly limit the jury's consideration of mitigating evidence. (*Sánchez*, at pp. 487-488.) "A trial court is not required to delete inapplicable sentencing factors or to instruct that statutory mitigating factors are relevant solely as potential mitigators." (*People v. Streeter* (2012) 54 Cal.4th 205, 268.) " 'Except for evidence of other crimes and prior convictions, jurors need not find aggravating factors true beyond a reasonable doubt; no instruction on burden of proof is needed; the jury need not achieve unanimity except for the verdict itself; and written findings are not required.' " (*Sánchez*, at p. 487.) "Intercase proportionality review is not required." (*Id*. at p. 488.) "California's use of the death penalty does not violate international law." (*Ibid*.) The court need not instruct the jury that the prosecutor has the burden of persuasion regarding the existence of aggravating factors, the weight of aggravating versus mitigating factors, and the appropriateness of a death judgment. (*People v. Mendoza* (2016) 62 Cal.4th 856, 916.) There is no presumption of life. (*People v. Parker* (2017) 2 Cal.5th 1184, 1233.)

"Finally, the cumulative impact of these purported deficiencies in California's death penalty scheme does not render the penalty unconstitutional. We have rejected each of [defendant's] challenges to the death penalty statute, and these challenges are no more persuasive when considered together." (*People v.*

*Simon* (2016) 1 Cal.5th 98, 150.) "California's capital sentencing scheme as a whole provides adequate safeguards against the imposition of arbitrary or unreliable death judgments." (*People v. Williams* (2008) 43 Cal.4th 584, 648; accord, *People v. Johnson* (2016) 62 Cal.4th 600, 658.)

## V. CONCLUSION

We affirm the judgment.

**CHIN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C.J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**BAKER, J.\***

---

\*       Associate Justice of the Court of Appeal, Second Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**DISSENTING OPINION BY LIU, J.**

Defendant Warren Hardy, a black man, was convicted and sentenced to death for raping and murdering Penny Sigler, a white woman. During jury selection, the prosecutor used peremptory strikes to remove every black juror she could have removed. She struck the only black prospective juror from the main panel, Frank G. (Juror No. G-2041), and the first two black prospective jurors from the alternate panel, Darin B. (Juror No. B-3747) and Marion H. (Juror No. H-4826). One black juror, Juror No. S-6169, was eventually seated as the fourth and final alternate after both parties had exhausted their peremptory strikes. (I refer to prospective jurors by name after initially identifying their juror number. I refer to seated jurors by number only; their names are under seal in the record.)

After jury selection, Hardy brought a motion under *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*). The prosecutor gave six reasons for striking Frank G.; the trial court accepted the reasons without elaboration. Today's opinion affirms the trial court's ruling, finding three reasons "especially strong" and three reasons "weak" or "not . . . very convincing" but "legitimate" when considered "in combination with the other reasons." (Maj. opn., *ante*, at pp. 28–29.)

I respectfully disagree. In light of all of the relevant circumstances — including the answers given by Frank G. and other jurors on their questionnaires and during voir dire, the fact that the prosecutor did not question Frank G. about

several concerns she identified as reasons for striking him, and her apparent lack of concern about nonblack jurors with similar traits — I cannot affirm the trial court's ruling, which is devoid of any reasoned evaluation of the prosecutor's reasons for the strike.  " '[T]he Constitution forbids striking even a single prospective juror for a discriminatory purpose.' " (*Snyder v. Louisiana* (2008) 552 U.S. 472, 478 (*Snyder*).)  The standard is whether it is "more likely than not that the challenge was improperly motivated." (*Johnson v. California* (2005) 545 U.S. 162, 170; *People v. Gutierrez* (2017) 2 Cal.5th 1150, 1158 (*Gutierrez*).)  That standard has been met here, and because the error undermines the fairness of the trial, the judgment must be reversed.

## I.

Today's opinion acknowledges two reasons why "the prosecutor's use of peremptory challenges warrants close scrutiny.  First, although the numbers are small, she excused every African-American prospective juror she could have excused—one while selecting the main panel and two while selecting the alternates. . . .  Second, this case had definite racial overtones.  Defendant is African-American; the victim was White.  Defendant told the police that she had yelled a racial slur at him and his cohorts, triggering the incident." (Maj. opn., *ante*, at pp. 22.)  These circumstances are indeed "troubling" and " 'raise[] heightened concerns.' " (*Id.* at p. 23.)

I would add three further observations as context for evaluating the *Batson* issue here.  First, there is reason to believe Frank G. "should have been an ideal juror in the eyes of a prosecutor seeking a death sentence." (*Miller-El v. Dretke* (2005) 545 U.S. 231, 247 (*Miller-El*).)  At the time of Hardy's trial, Frank G. was a 68-year-old married homeowner in South Central Los Angeles with five grown children and four grandchildren.  He previously served 10 years in Air Force intelligence, achieving the rank of staff sergeant.  He held a supervisory position at

the Hertz car rental company, evaluating liability claims and assisting in civil litigation. On his juror questionnaire, he wrote that he "enjoy[s] his present position and take[s] pleasure in resolving difficult cases."

Frank G. indicated on the questionnaire that he "favor[ed]" the death penalty — a view that he said had not changed over time — and he felt it was used "too seldom." He believed California should have the death penalty because "certain crimes deserve" such punishment. He did not report any "social, philosophical, or religious convictions" that would prevent him from voting to impose the death penalty, and he was not a member of any organization that opposed capital punishment. He wrote that he could see himself personally voting for death for "heinous crimes" and that he was "not likely" to take a defendant's background or childhood experiences into consideration when doing so. When defense counsel asked Frank G. to expand on this answer, he said it would be "difficult" for him to consider the defendant's background because "everybody has their own choices in life," but he ultimately said he could consider such evidence.

The year before Hardy's trial, Frank G. had been the victim of a home burglary. Although the person responsible was never identified or arrested, he said he was "satisfied" with the police's conduct in that case. Ten years before Hardy's trial, he had been falsely arrested for car theft due to a "computer error by [the] rental agency." The case was dismissed, and he wrote on the questionnaire that he had been "treated fairly by police" and that "justice [was] served." Asked his views on what should be done about crime, Frank G. wrote, "Hire more law enforcement" and "Enforce, strongly, current laws." In his view, the major crime problem in Los Angeles was "gang activity" that led to "too many innocent persons [being] harmed." When asked for his "thoughts about how childhood experiences affect a person's development in relationship to committing criminal

3

acts," he wrote, "I don't believe in too many mitigating factors. People have choices." He checked "no" when asked whether he believed "a person's upbringing may relieve that individual from responsibility for committing violent or criminal acts." Overall, he thought the criminal justice system was "slow but in most cases fair." He also wrote, "I sincerely respect judges."

When asked about prejudice and biases, Frank G. wrote, "I experienced racial prejudice while in the Air Force stationed in San Antonio, Texas in 1952," and "I am biased against drug & alcohol abusers and gang activity." He checked "yes" when asked if he "believe[d] that a white/caucasian person can be the victim of a hate crime." When asked if there were "any reasons [he] might be biased or prejudiced either for, or against, Black Americans," he wrote, "No."

Frank G. had never served on a jury before. He wrote that "[i]f selected, [he] will serve," that "[i]t is my duty as [a] citizen to serve," and that he expected to be "fair, impartial & listen to evidence" as a juror. When asked "[w]hat is it about yourself that makes you feel you can be an impartial juror," he wrote, "I am a good listener and observer." When asked "whether your attitudes on our criminal justice system are such that you would be leaning towards the prosecution or the defense stance before hearing both sides," he wrote, "I would not lean one way or the other until all evidence is heard."

The prosecutor asked very few questions of Frank G. during voir dire. In addition to the topics discussed further below, the prosecutor asked him "what [his five kids] do for a living." Consistent with his questionnaire, Frank G. said they worked as a cement mason, a construction foreman, a human resource director, an owner of a maintenance business, and an accounting director, respectively.

Second, the prosecutor gave six reasons for striking Frank G. We recently said that when confronted with this " 'laundry list' approach (*Foster v. Chatman* (2016) 578 U.S. __, __ [136 S.Ct. 1737, 1748])," courts must be cognizant that

4

"[a] prosecutor's positing of multiple reasons, some of which, upon examination, prove implausible or unsupported by the facts, can in some circumstances fatally impair the prosecutor's credibility. (See *U.S. v. Chinchilla* (9th Cir. 1989) 874 F.2d 695, 699 [where two bases for the challenges were acceptable and two were not, appellate court holds motion under *Batson* should have been granted: 'the fact that two of the four proffered reasons do not hold up under judicial scrutiny militates against [the supported reasons'] sufficiency'].)" (*People v. Smith* (May 21, 2018, S065233) __ Cal.5th __ [pp. 24–25] (*Smith*).) The level of suspicion here is further heightened by the fact that the prosecutor did not ask Frank G. or various seated jurors about any of the concerns that today's opinion finds especially strong. (See *Miller-El*, *supra*, 545 U.S. at p. 246 ["[T]he prosecution asked nothing further about the [purported reason], as it probably would have done if the [reason] had actually mattered."]; *id.* at p. 250, fn. 8 ["the failure to ask undermines the persuasiveness of the claimed concern"]; *Gutierrez*, *supra*, 2 Cal.5th at p. 1170 [lack of inquiry by the prosecutor "raises a question as to how interested he was in meaningfully examining" the issue proffered as a reason for a contested strike].)

Third, in ruling on Hardy's *Batson* motion, the trial court made a " ' "global finding" ' " with no reasoned analysis of any of the prosecutor's stated concerns. (Maj. opn., *ante*, at p. 23.) "A trial court's conclusions are entitled to deference only when the court made a 'sincere and reasoned effort to evaluate the nondiscriminatory justifications offered.' " (*Gutierrez*, *supra*, 2 Cal.5th at p. 1159.) In *Gutierrez,* we concluded that "[b]ecause the prosecutor's reason for [a contested] strike was not self-evident and the record is void of any explication from the court, we cannot find under these circumstances that the court made a *reasoned* attempt to determine whether the justification was a credible one." (*Id.* at p. 1172.) Here, the stated reasons are also not self-evident; by the court's own

5

admission, at least two of the reasons are "weak," and the demeanor-based reason finds no support in the record. (Maj. opn., *ante*, at pp. 28–29.) Further, the fact that the trial court did not comment on the discrepancy between the prosecutor's first reason and Frank G.'s answer on the questionnaire (*id.* at p. 24) suggests that the trial court had not carefully examined the stated reasons when it ruled. We cannot apply a deferential standard of review in this case. (See *Gutierrez*, at pp. 1171–1172; *People v. Silva* (2001) 25 Cal.4th 345, 385–386; *People v. Fuentes* (1991) 54 Cal.3d 707, 716, fn. 5, 717; cf. *Smith*, *supra*, __ Cal.5th at p. __ [p. 25] [deferring to trial court's ruling on multiple reasons stated by the prosecutor where "[t]he court engaged actively in the third-stage analysis, questioning counsel closely on certain points"].) We must undertake our own independent review of the record.

## II.

With this backdrop, I now examine each of the prosecutor's stated reasons. As I explain, this is not a case where a prosecutor has given several highly credible reasons and some less so. Each one of the stated reasons is problematic and raises doubts about the neutrality of the strike.

## A.

First, the prosecutor said Frank G. "indicated on question no. 42, 'police are not always truthful and tend to exaggerate.' " As today's opinion acknowledges, the prosecutor was mistaken. In answer to question 42, Frank G. wrote, "I believe prosecutors are not always truthful and tend to exaggerate," and in answer to question 44, he wrote he had the "same" view of defense counsel.

The prosecutor's mistake can be understood in one of two ways. The prosecutor could have actually intended to say Frank G. believed *police* are not always truthful and tend to exaggerate. If so, the prosecutor's concern would lack support in the record. Nothing in the record suggests that Frank G. had such views

6

of the police. As noted, he said he was satisfied with the police's conduct when his home was burglarized the year before the trial, he felt he had been treated fairly by the police during his false arrest for car theft, and he felt a solution to reducing crime was to "[h]ire more law enforcement." The prosecutor did not question Frank G. about his views of the police. Nor did the prosecutor raise this issue with Juror No. C-1938, who wrote on his questionnaire that he would not automatically trust a police officer's testimony because "[p]olice have been known to embellish or withhold facts, plant evidence and perjure themselves."

Alternatively, the prosecutor could have meant to say Frank G. believed *prosecutors* are not always truthful and tend to exaggerate. If so, it is unclear why Frank G., who indicated an identical negative view of defense counsel, would not have been a good juror for the prosecution, especially in light of his strong support for the death penalty and his other pro-law enforcement views. Today's opinion speculates that "[a] juror who distrusts both sides of a case may well be more likely to have a reasonable doubt and thus be problematic for the prosecution." (Maj. opn., *ante*, at p. 27.) The court further speculates that such a juror "might reasonably be of even greater concern to a prosecutor" because prosecutors, unlike defense counsel, "are expected, even required, to be truthful and to seek justice, not a conviction at any cost." (*Id.* at p. 26.) But it is hardly obvious that Frank G.'s expressed neutrality would have had such lopsided consequences or, more importantly, that any of this was the prosecutor's concern.

In *Gutierrez*, the prosecutor stated as a reason for striking a Hispanic juror that " '[s]he's from Wasco and she said that she's not aware of any gang activity going on in Wasco.' " (*Gutierrez*, *supra*, 2 Cal.5th at p. 1160.) We said "[i]t is conceivable . . . that the prosecutor genuinely believed gang activity to be so rampant in Wasco that this panelist must have been either untruthful or uninformed in denying her awareness of Wasco gang activity. If this had been the

7

case, such reasoning should have been articulated by the prosecutor. '[A] prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. A *Batson* challenge does not call for a mere exercise in thinking up any rational basis.' " (*Id.* at p. 1169, quoting *Miller-El*, *supra*, 545 U.S. at p. 252.) Similarly here, even if Frank G. "may well" or "might reasonably" have posed the concerns suggested by the court (maj. opn., *ante*, at pp. 26–27), "such reasoning should have been articulated by the prosecutor" (*Gutierrez*, at p. 1169).

The trial court did not notice the prosecutor's mistake and thus did not probe the nature of the prosecutor's concern. Today's opinion finds it "significant" that defense counsel did not point out the mistake and says "[i]t is unrealistic to expect the trial court to discover the mistake under trial conditions when it was not brought to the court's attention. Many jurors were examined over several days, and hundreds of prospective jurors filled out the 52-page questionnaire containing 237 questions." (Maj. opn., *ante*, at p. 25.)

But this reasoning is at odds with what we said in *Gutierrez*. There, as in this case, the prosecutor gave a reason (the Wasco issue) that "left some lucidity to be desired" (*Gutierrez*, *supra*, 2 Cal.5th at p. 1169) and "was not self-evident" (*id.* at p. 1172), and the trial court "made a global finding that the prosecutor's strikes were neutral and nonpretextual" (*id.* at p. 1157). Our opinion in *Gutierrez* contains no indication that defense counsel pointed out to the trial court why the stated reason was infirm. Regardless, in reversing the judgment, we faulted the trial court for "never clarif[ying] why it accepted the Wasco reason as an honest one." (*Id.* at p. 1171.) We did not say it was "unrealistic to expect the trial court to discover" the inadequacy of the stated reason without the aid of defense counsel (maj. opn., *ante*, at p. 25); the role of defense counsel played no part in our analysis. Instead, we said: "Providing an adequate record may prove onerous,

8

particularly when jury selection extends over several days and involves a significant number of potential jurors. It can be difficult to keep all the panelists and their responses straight. Nevertheless, the obligation to avoid discrimination in jury selection is a pivotal one. It is the duty of courts and counsel" — it is clear in context that "counsel" here refers to the prosecutor — "to ensure the record is both accurate and adequately developed." (*Gutierrez*, at p. 1172.)

In sum, whether or not defense counsel elucidates the infirmity of a stated reason, the trial court has an independent obligation to make "a *reasoned* attempt to determine whether the justification was a credible one." (*Gutierrez*, *supra*, 2 Cal.5th at p. 1172.) Here, as in *Gutierrez*, that did not happen. And because the nature of the prosecutor's concern is "not self-evident" in light of the record (*ibid.*), the first stated reason does not weigh in favor of her credibility.

**B.**

The prosecutor's second reason for striking Frank G. was that he spoke to attorneys daily and knew "50 to 60 civil or criminal lawyers." The prosecutor did not inquire into Frank G.'s relationships with lawyers, nor did she ask whether he had developed any views on criminal law through those interactions. (See *Miller-El*, *supra*, 545 U.S. at p. 246 ["[T]he prosecution asked nothing further about the influence his brother's history might have had on [the prospective juror], as it probably would have done if the family history had actually mattered."].)

In addition, Juror No. M-7421 indicated on her questionnaire that she knew "too many [lawyers] to name since [she] worked as a legal secretary for over 8 years," yet the prosecutor accepted her on the main panel without asking any question about her relationships with lawyers. Juror No. L-3164 and Juror No. S-3388 had lawyers in their families; the prosecutor also accepted them on the main panel without questioning. Nor did the prosecutor ask questions on this topic of Jeffrey W. (Juror No. W-6681), who had close lawyer acquaintances and was

9

studying to be a paralegal; Jeffrey W. was accepted as an alternate by the prosecutor but struck by the defense. (See *Miller-El*, *supra*, 545 U.S. at pp. 248, 250, fn. 9 [jurors accepted by the prosecution but struck by the defense are relevant comparators].) Frank G. does not appear to have been any closer to attorneys than jurors to whom the prosecutor did not object. (See *SmithKline Beecham Corp. v. Abbott Labs.* (9th Cir. 2014) 740 F.3d 471, 478, fn. 4 (*SmithKline*) [finding pretextual the claim that a juror was stricken because he was "acquainted with many people in the legal field" when "other jurors with close relatives who were lawyers were not stricken but served on the jury"].)

The prosecutor's stated concern was not that Frank G. was himself a lawyer or had legal education, but instead that he knew and worked with lawyers. Specifically, Frank G. worked with lawyers involved in civil litigation on behalf of a car rental company, not criminal cases. It is not clear why his work on such matters would have made him an undesirable juror for the prosecution, and the prosecutor did not explain her reasoning. "The prosecutor may have conveyed the gist of [her] concern . . . but [her] explanation left some lucidity to be desired." (*Gutierrez*, *supra*, 2 Cal.5th at p. 1169.)

## C.

The prosecutor's third reason was that Frank G. "did not want to sit on this case." As today's opinion acknowledges, this reason is "rather weak." (Maj. opn., *ante*, at pp. 27–28.)

Frank G. wrote in his questionnaire that he "would not like to sit on this jury due to the nature of the alleged crimes." But Frank G. was not the only one concerned about the nature of the crimes. Juror No. A-4635 wrote that he did not want to sit on the case because "the nature of the crime alone ma[de] [him] sick." Juror No. M-7421 wrote that "[t]he violent nature of this case [was] disturbing to [her]." And Juror No. B-0057 wrote that he did not want to sit on the case

10

"because of the seriousness of the crime."  All of those jurors served on the main panel without either party questioning them about those answers.

During voir dire, the prosecutor did not ask Frank G. about his comment regarding the nature of the crimes.  Instead, the prosecutor asked, "I think on your questionnaire you indicated that you did not want to sit as a juror in this particular case.  Was there a particular reason, other than it's a big decision?"  Frank G. answered, "Other than it's a big decision, is probably maybe the length of the trial.  But I guess I can live with the length of the trial, as long as it's not more than 30 days."  As today's opinion recounts, Frank G. "was concerned serving as a juror might interfere with trial in the case he was involved with in Santa Monica.  The prosecutor and court explained to him that this trial would probably end before his other trial would begin.  Additionally, the court told the juror it had 'a great deal of influence with that Santa Monica court.'  The reassurance seemed to satisfy the juror." (Maj. opn., *ante*, at p. 27.)  Indeed, Frank G. said he would be amenable to a trial of two weeks' length and the arrangement proposed by the trial court.

The record thus indicates there was no basis for concern, in light of the trial court's assurances and Frank G.'s response, that Frank G. was unwilling to serve based on the length of the trial.  Moreover, four jurors who served on the main panel — Juror No. S-5904, Juror No. A-4635, Juror No. M-7421, and Juror No. L-3164 — as well as Jeffrey W., who was struck by the defense, also expressed concerns that the length of the trial would cause them to miss work, school, or medical appointments, or result in financial hardship.  None of those jurors was questioned by the prosecutor about such concerns.  The circumstances here are similar to those in *Snyder,* where the high court found pretextual the prosecutor's explanation that he struck a black juror, Mr. Brooks, because the juror had a student-teaching obligation that would impair his ability to serve fully and impartially on the jury. (*Snyder*, *supra*, 552 U.S. at pp. 479–485.)  In response to

11

the stated concern, the trial court contacted Mr. Brooks's dean, who said "he did not think [Mr. Brooks's jury service] would be a problem," and "the record contains no suggestion that Mr. Brooks remained troubled after hearing the report of the dean's remarks." (*Id.* at p. 482.) In addition, "[t]he implausibility of this explanation is reinforced by the prosecutor's acceptance of white jurors who disclosed conflicting obligations that appear to have been at least as serious as Mr. Brooks'." (*Id.* at p. 483.)

**D.**

The prosecutor's fourth reason for striking Frank G. was his 1992 arrest by the Los Angeles County Sheriff's Department. Although "[w]e have repeatedly upheld peremptory challenges made on the basis of a prospective juror's *negative* experience with law enforcement" (*People v. Turner* (1994) 8 Cal.4th 137, 171, italics added), the record does not indicate that Frank G. had a negative experience with law enforcement in the context of his 1992 arrest. This was not an instance in which a prospective juror had been wrongly arrested because of a mistake or malice on the part of law enforcement. Frank G. made clear in his questionnaire that the false arrest resulted from a "computer error by rental agency." He further indicated that the case was dismissed, that he felt he was "treated fairly by police," and that "justice [was] served." Frank G.'s experience with his 1992 arrest also must be considered together with his expressed satisfaction with the police's conduct when his home was burglarized the year before the trial, as well as his comment that the solution to reducing crime was to "hire more law enforcement." The record does not indicate that the 1992 arrest, which occurred 10 years before this jury selection process, caused Frank G. to have negative views of law enforcement or otherwise supported the prosecutor's assertion that "he would not be a good prosecutorial juror."

12

Further, the prosecutor did not object to other panelists who reported potentially negative experiences with the criminal justice system. Juror No. A-4635 had witnessed "police beating someone" and had been jailed for driving under the influence, yet the prosecutor asked no questions about either experience. The prosecutor likewise accepted Juror No. R-5785, who had gone to court for a traffic violation and lost. And Jeffrey W. said he was dissatisfied with the police's conduct on two occasions — one in which he was the victim of vandalism and another in which he was arrested and jailed for possession of alcohol as a minor — but the prosecutor accepted him without asking any questions about either incident.

The prosecutor did follow up with some prospective jurors, including Juror No. R-5785, about their interactions with police. But she did not ask Frank G. any questions about his 1992 arrest. Of course, the prosecutor had no duty to attempt to rehabilitate all the panelists about whom she harbored doubts. But her lack of evenhandedness in investigating the reasons that purportedly concerned her is suggestive, and especially so because the stated reason — being arrested (or, more accurately, being arrested with no charges filed) — is known to disproportionately affect African Americans. (See *Miller-El*, *supra*, 545 U.S. at p. 255 ["contrasting *voir dire* questions posed respectively to black and nonblack panel members" are probative of racial discrimination]; *People v. Buza* (2018) 4 Cal.5th 658, 698 (dis. opn. of Liu, J.) [citing data showing that in California, African Americans are 6.5 percent of the population but made up 20.3 percent of adult felony arrestees in 2016, and "felony arrests of African Americans disproportionately result in no charges or dropped charges"].)

### E.

The prosecutor's fifth reason was that Frank G. "refused to smile" at her during voir dire but smiled at the defense. Although a prospective juror's

13

demeanor can be a race-neutral justification for a peremptory strike, the trial court did not make any findings about Frank G.'s demeanor. Here, as in *Snyder*, "[i]t is possible that the judge did not have any impression one way or the other concerning [the prospective juror's] demeanor." (*Snyder*, *supra*, 552 U.S. at p. 479.) *Snyder* found it relevant that the juror at issue "was not challenged until the day after he was questioned, and by that time dozens of other jurors had been questioned." (*Ibid.*) In this case, 11 days passed between the prosecutor's brief questioning of Frank G. and Hardy's *Batson* motion. "Thus, the trial judge may not have recalled [the prospective juror's] demeanor. Or, the trial judge may have found it unnecessary to consider [the prospective juror's] demeanor, instead basing his ruling completely on the [other] proffered justification[s] for the strike." (*Ibid.*) In these circumstances, a demeanor-based reason does not weigh in favor of the prosecutor's credibility, and the court agrees this is not an "especially strong" reason for the strike. (Maj. opn., *ante*, at p. 29; see *Harris v. Hardy* (7th Cir. 2012) 680 F.3d 942, 965 ["Demeanor-based explanations for a strike are particularly susceptible to serving as pretexts for discrimination."]; *United States v. McMath* (7th Cir. 2009) 559 F.3d 657, 665–666; *Brown v. Kelly* (2d Cir. 1992) 973 F.2d 116, 121.)

## F.

The prosecutor's sixth reason for striking Frank G. was that he indicated on his questionnaire that life without parole was worse than the death penalty. Today's opinion acknowledges that this "might also be considered a weak reason." (Maj. opn., *ante*, at p. 29.)

Frank G. was not alone in initially indicating that life without parole might be worse than the death penalty. Juror No. C-1938 and Juror No. S-8868, both of whom served on the main panel, also indicated on their questionnaires that life without parole was worse than the death penalty. In fact, Juror No. C-1938's

14

answer as to why he thought life without parole was worse ("The defendant will not only lose his/her freedom, but will have the time to contemplate his/her actions") was substantially similar to the answer Frank G. gave ("you think about what you did, the crime that you committed and the fact that you're going to be locked up for the rest of your life without no possibility of getting out, it could have a trying effect on a person's mind"). But the prosecutor did not ask Juror No. C-1938 any questions about his views on the death penalty. Meanwhile, Frank G., who favored the death penalty and thought it was used "too seldom," said in answer to questioning by defense counsel that he could accept that death was the worse penalty, as the law required.

*Miller-El* is on point. There, the prosecutor similarly stated that he struck a black juror because the juror " 'suggested that the death penalty was an easy way out, that they should be made to suffer more.' " (*Miller-El*, *supra*, 545 U.S. at p. 248.) While acknowledging that "the explanation is reasonable" on its face, the high court said "its plausibility is severely undercut by the prosecution's failure to object to other panel members who expressed views much like [the struck juror's]." (*Ibid.*) "The fact that [the prosecutor's] reason also applied to these other panel members, most of them white, none of them struck, is evidence of pretext." (*Ibid.*)

## G.

The analysis above — together with the racial overtones of this case, the fact that the prosecutor struck every black juror she could have struck, and Frank G.'s background and personal views, including his strong support for law enforcement and the death penalty — leads me to conclude that it was more likely than not that the strike of Frank G. was impermissibly motivated by race.

In resisting this conclusion, today's opinion resorts to the familiar argument that no unexcused juror was similar enough to the excused juror to allow an

15

inference of discrimination to be drawn from comparative juror analysis. (Maj. opn., *ante*, at pp. 29–30.) It is true that the prosecutor said, "I felt that all of these things, *in combination*, . . . indicated that he would not be a good prosecutorial juror." (Italics added.) But Jeffrey W. was closely matched as to three of the reasons: he also had professional ties to attorneys, he preferred to not sit on the case, and he had been arrested (but, unlike Frank G., was not satisfied with the police's conduct). Jeffrey W. was also similar to Frank G. in other ways: both were older and married, both believed the solution to crime involved more law enforcement, both strongly believed in personal responsibility, and both reported they were in favor of the death penalty and felt it was used "too seldom." Yet the prosecutor accepted Jeffrey W. without questioning.

Today's opinion says "parties with limited peremptory challenges generally cannot excuse every potential juror who has any trait that is at all problematic. They must instead excuse those they believe will be most problematic under all the circumstances." (Maj. opn., *ante*, at pp. 29–30.) But that point rings hollow here. Each side had 20 strikes available in selecting the main panel, and the prosecutor used only five of those strikes. She had ample strikes available to remove nonblack jurors with traits she purportedly found problematic in Frank G., and there were 33 prospective jurors still left in the venire at the end of jury selection. These circumstances cast further doubt on the credibility of her stated concerns.

In any event, the fact that no other juror exactly matched Frank G. does not dispel the inference of pretext arising from comparative juror analysis. The high court squarely addressed this issue in *Miller-El*: "The dissent contends that there are no white panelists similarly situated to [two black prospective jurors who were struck] because ' " '[s]imilarly situated' does not mean matching any one of several reasons the prosecution gave for striking a potential juror — it means

16

matching *all* of them." ' [Citation.] None of our cases announces a rule that no comparison is probative unless the situation of the individuals compared is identical in all respects, and there is no reason to accept one. . . . A *per se* rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters." (*Miller-El*, *supra*, 545 U.S. at p. 247, fn. 6.)

The high court has repeatedly drawn inferences of discrimination from comparative juror analysis without regard to whether the comparator jurors matched the struck juror in every respect identified by the prosecutor. (See *Foster v. Chatman*, *supra*, 578 U.S. at pp. __–__ [136 S.Ct. at pp. 1750–1751] (*Foster*); *Snyder*, *supra*, 552 U.S. at pp. 483–484; *Miller-El*, *supra*, 545 U.S. at pp. 244–245, 248.) The high court has found such analysis probative even with a single comparator juror. (See *Foster*, at p. __ [136 S.Ct. at p. 1754] ["[The prosecutor] also stated that he struck Hood because Hood's wife worked at Northwest Regional Hospital . . . . But [he] expressed no such concerns about white juror Blackmon, who had worked at the same hospital."]; *Snyder*, at p. 484 ["If the prosecution had been sincerely concerned that Mr. Brooks would favor a lesser verdict than first-degree murder in order to shorten the trial, it is hard to see why the prosecution would not have had at least as much concern regarding Mr. Laws."].)

Moreover, the high court's case law makes clear that comparative juror analysis can give rise to an inference of pretext even when a prosecutor's stated reason is "not explicitly contradicted by the record" (*Foster*, *supra*, 578 U.S. at p. __ [136 S.Ct. at p. 1750], is "otherwise legitimate" (*id.* at p. __ [136 S.Ct. at p. 1751], or is "reasonable" on its face (*Miller-El*, *supra*, 545 U.S. at p. 248). The initial plausibility of a stated reason does not end the analysis; " 'a sensitive

17

inquiry' " into " 'all of the circumstances that bear upon the issue' " can reveal such a reason to be pretextual. (*Foster*, at p. __ [136 S.Ct. at p. 1748].)

As shown above, the prosecutor's disparate treatment of Frank G. and nonblack jurors pervades every one of her stated reasons other than demeanor. Yet today's opinion does not contain any analysis of a specific comparator juror — not a single one. The court's breezy treatment of comparative juror analysis — "There will always be some similarities between excused jurors and nonexcused jurors" (maj. opn., *ante*, at p. 30) — unduly minimizes probative evidence bearing on the prosecutor's motivation and cannot be squared with high court precedent.

**H.**

The court understands this case to involve three "especially strong" reasons and three "weak" or "not . . . very convincing" reasons. (Maj. opn., *ante*, at pp. 28–29.) As explained above, I do not find the "especially strong" reasons to be especially strong at all. But even on the court's accounting, it is unclear why the court does not consider the weak reasons to be significant evidence of pretext.

The court says Frank G.'s reluctance to sit on the jury and his belief that life without parole was worse than the death penalty are "weak reason[s]" when considered "[i]n isolation" or "standing alone," but "in combination with the other reasons" or when "add[ed] to the others," these reasons are "legitimate." (Maj. opn., *ante*, at pp. 28, 29.) I do not see the logic here. How does a reason that is weak in isolation become legitimate when combined with other reasons? In this case, there is nothing in the other reasons that somehow bolsters the legitimacy of the reasons that the court finds weak on their own. Weak reasons do not become "legitimate" when given alongside other reasons. If anything, the weak reasons erode the credibility of the other reasons by suggesting there is more to the prosecutor's motivation than if she had given only the other reasons by themselves. (*Smith*, *supra*, __ Cal.5th at pp. __–__ [pp. 24–25]; see *Snyder*,

18

*supra*, 552 U.S. at p. 485 ["The prosecution's proffer of [a] pretextual explanation naturally gives rise to an inference of discriminatory intent."].)

The high court has not addressed how *Batson* analysis should proceed when a prosecutor has given multiple reasons and a court has found some of them credible and others implausible and indicative of discrimination. Some courts have applied a mixed-motive analysis, inquiring whether the prosecutor "would have struck [the juror] even if he had not been motivated in part by an improper purpose." (See, e.g., *Jones v. Plaster* (4th Cir. 1995) 57 F.3d 417, 421.) The Ninth Circuit has rejected mixed-motive analysis and "limit[s] [the] inquiry to whether the prosecutor was 'motivated in substantial part by discriminatory intent.' " (*Cook v. LaMarque* (9th Cir. 2010) 593 F.3d 810, 815.) Other courts have held that "[r]egardless of how many other nondiscriminatory factors are considered, any consideration of a discriminatory factor directly conflicts with the purpose of *Batson* and taints the entire jury selection process." (*Arizona v. Lucas* (Ariz.Ct.App. 2001) 18 P.3d 160, 163; see, e.g., *McCormick v. State* (Ind. 2004) 803 N.E.2d 1108, 1113; *State v. Shuler* (S.C. 2001) 545 S.E.2d 805, 811; *Ex parte Sockwell* (Ala. 1995) 675 So.2d 38, 41.) There is no need in this case to choose among these approaches because none of the prosecutor's reasons withstands scrutiny. I would only note that none of these varied authorities supports the view that a "weak" reason can somehow become "legitimate" when considered "in combination" with others. (Maj. opn., *ante*, at pp. 28, 29 [citing no authority on this point].)

## III.

The discussion above is enough to decide this case. But there is an additional circumstance that raises suspicion. As today's opinion notes, the prosecutor struck two black jurors during the selection of alternates, and those strikes are relevant "for whatever light [they] may shed on the validity of her

19

reasons for excusing Frank G." (Maj. opn., *ante*, at p. 22; see *Snyder*, *supra*, 552 U.S. at p. 478 [consideration of all relevant circumstances includes "consider[ing] the strike of [one juror] for the bearing it might have upon the strike of [another juror]"].) Especially relevant is the prosecutor's strike of Marion H.

In the process of selecting four alternate jurors, each side had four peremptory strikes. After two strikes by the prosecution (both against white women) and two by the defense (both against white men), the trial court called Marion H., a black woman, to the jury box. The prosecutor questioned Marion H. in some depth about her career plans and then asked the trial court how alternates would be called to the main jury panel if needed. The trial court said alternates would be called in the order they were seated, not at random. The prosecutor accepted the panel with Marion H. as the fourth alternate. The defense then used its two remaining strikes (against Karyn R. (Juror No. R-4749) and Jeffrey W., both white); the first of these strikes caused Marion H. to move to the third alternate position. Next, the trial court called Darin B., a black man, to the jury box, and the prosecutor used her third strike against him. The trial court then called Juror No. G-2235, a white woman, to sit as the fourth alternate; Juror No. S-6169, a black woman, was next in line. The prosecutor questioned Juror No. S-6169 extensively, questioned Juror No. G-2235 briefly, and then used her final strike on Marion H. As a result, Juror No. S-6169 served as the fourth alternate.

This sequence of events shows that before using her final strike against Marion H., the prosecutor asked how alternates would be called to the main panel if needed, and the trial court said alternates would be called in the order they were seated, not at random. At that point, the prosecutor knew she could not avoid having one black juror on the alternate panel, and her strike of Marion H., who was seated in the third alternate position, ensured that the one black juror would be in the fourth position and thus least likely to serve.

20

Further, at the time Marion H. was struck, Juror No. G-2235 was seated in the fourth alternate position, and Juror No. S-6169 was next in line. The prosecutor first questioned Juror No. S-6169 extensively, asking about her husband's former work as a judge; her own work experience as her husband's secretary and before that as a sports photographer, her view of the O.J. Simpson trial, and her husband's cousin, who had been shot. The prosecutor then asked Juror No. G-2235 three brief questions to confirm that her brother's past conviction for writing bad checks would not affect her decisionmaking in this case. The prosecutor did not ask Juror No. G-2235 about her ex-husband's conviction or about an incident where she was a victim of car theft and felt "[d]isappointed" because "[n]o one was arrested." The prosecutor's apparent eagerness and thoroughness in questioning Juror No. S-6169, compared to her much briefer and less probing questioning of Juror No. G-2235, suggest an aim to ensure that only one black juror would sit as an alternate and to determine whether Marion H. or Juror No. S-6169 would be more favorable. Notably, Marion H. and Juror No. S-6169 were the only jurors whom the prosecutor questioned in depth during the entire jury selection process.

It is true that the prosecutor twice accepted the alternate panel with Marion H. seated. (Maj. opn., *ante*, at p. 32.) But the first time the prosecutor passed, Marion H. was positioned as the fourth alternate and was thus unlikely to serve — a fact of which the prosecutor was aware, since she had just asked the trial court how alternates would be seated if needed on the main panel. In any event, a prosecutor's acceptance of a juror does not preclude a finding of improper motive when the juror is struck "eventually instead of immediately." (*Gutierrez*, *supra*, 2 Cal.5th at p. 1171; see *id.* at p. 1170 [finding *Batson* violation even though "the prosecutor passed on challenges five times while [the eventually struck juror] remained on the panel"]; *Williams v. Runnels* (9th Cir. 2006) 432 F.3d 1102, 1109

21

[prosecutor's acceptance of the jury "several times" with black jurors "does not refute the inference [of discrimination] when the prosecutor did" strike those black jurors].)

It is also possible the prosecutor believed Marion H. was less favorable than all of the jurors who ultimately served as alternates. But the reasons the prosecutor gave for the strike, while "plausible," are not very strong, as the court's cursory discussion acknowledges. (Maj. opn., *ante*, at p. 32.) And even if the prosecutor had genuine concerns about Marion H., that is not inconsistent with an intent to ensure that only one black juror would serve as an alternate and that the black juror would sit in the fourth and last position. This is an additional factor bearing on the prosecutor's overall approach to jury selection.

## IV.

"Purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure. 'The very idea of a jury is a body . . . composed of the peers or equals of the person whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status in society as that which he holds.' " (*Batson*, *supra*, 476 U.S. at p. 86.) It is elementary that "the State denies a black defendant equal protection of the laws when it puts him on trial before a jury from which members of his race have been purposefully excluded." (*Id.* at p. 85.) Yet that is what happened here. As a result of the prosecutor striking every black juror she could have struck, the black defendant in this capital case, charged with raping and murdering a white woman, was tried by a jury that included no black person. The prosecutor's reasons for striking the one black juror who could have served on the main panel appear pretextual, especially in light of her disparate treatment of similar nonblack jurors.

22

Racial discrimination in jury selection violates not only the defendant's right to equal protection but also the prospective juror's "right not to be excluded from [the jury] on account of race." (*Powers v. Ohio* (1991) 499 U.S. 400, 409 (*Powers*); see *id.* at p. 407 ["[W]ith the exception of voting, for most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process."].) Frank G. was a family man, a supervisor in a major company, and a strong supporter of law enforcement and the death penalty. He strongly believed in individual responsibility. He had sincere respect for judges, and he believed the criminal justice system was fair. He understood his duty as a citizen to serve, and he understood that a juror must listen to both sides before making a judgment. Especially in light of his personal qualities, it seems more likely than not that the strike of this juror was based "on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." (*Batson*, *supra*, 476 U.S. at p. 89.) Frank G. was improperly denied "a significant opportunity to participate in civic life." (*Powers*, at p. 409.)

Today's decision prompts one final observation: Over the past three decades, *Batson* has been extended to prohibit discrimination against any prospective juror based on race, ethnicity, gender, and (in some jurisdictions) sexual orientation, whether or not the defendant and the juror share the same background. (See *J.E.B. v. Alabama ex rel. T.B.* (1994) 511 U.S. 127, 130–131; *Hernandez v. New York* (1991) 500 U.S. 352, 371–372; *Powers*, *supra*, 499 U.S. at p. 402; *SmithKline*, *supra*, 740 F.3d at p. 486; *People v. Garcia* (2000) 77 Cal.App.4th 1269, 1272–1281.) But it must be remembered that *Batson* itself, like the case now before us, involved a black defendant tried by a jury empaneled after the prosecutor had removed all black persons from the venire. (*Batson*, *supra*, 476 U.S. at pp. 82–83; see *Wheeler*, *supra*, 22 Cal.3d at pp. 263–264 [same].) The high court's opinion responded specifically to the pernicious history of African

23

Americans being excluded from jury service, calling such exclusion "a primary example of the evil the Fourteenth Amendment was designed to cure." (*Batson*, at p. 85; see *id.* at pp. 103–105 (conc. opn. of Marshall, J.) [describing "common and flagrant" practice of using peremptory strikes to exclude black jurors].)

Against this historical backdrop, it is notable that more than 30 years have passed since this court has found the peremptory strike of a black juror to be improperly motivated by race. (See *People v. Snow* (1987) 44 Cal.3d 216; *People v. Turner* (1986) 42 Cal.3d 711; *People v. Hall* (1983) 35 Cal.3d 161.) Racial discrimination against black jurors has not disappeared here or elsewhere during that time. (See *Foster*, *supra*, 578 U.S. __ [136 S.Ct. 1737]; *Snyder*, *supra*, 552 U.S. 472; *Miller-El*, *supra*, 545 U.S. 231; *People v. Arellano* (2016) 245 Cal.App.4th 1139, 1144; *People v. Allen* (2004) 115 Cal.App.4th 542, 546–547, 553; *People v. Gray* (2001) 87 Cal.App.4th 781, 789–790; *People v. Turner* (2001) 90 Cal.App.4th 413, 418, 420–421.) And I seriously doubt that among the scores of *Batson* claims brought to our court (typically in capital cases), no meritorious claim involving a black juror has arisen in the past 30 years. (See *Crittenden v. Chappell* (9th Cir. 2015) 804 F.3d 998, 1012–1018; *People v. Chism* (2014) 58 Cal.4th 1266, 1338 (conc. & dis. opn. of Liu, J.); *People v. Williams* (2013) 56 Cal.4th 630, 699 (dis. opn. of Liu, J.); see also *People v. Harris* (2013) 57 Cal.4th 804, 885, 892–898 (conc. opn. of Liu, J.) [from 1993 to 2013, this court rejected *Batson* claims in 101 out of 102 cases presenting such claims]; *id.* at pp. 885–886 ["Even assuming, realistically, that most *Batson* claims raised in our court are fairly insubstantial, it is not difficult to identify cases that have presented closer questions. [Citations.]"].)

"Like my colleagues, I am confident that California's prosecutors and trial judges take seriously their responsibility to avert racial discrimination in jury selection. But one need not question the overall excellence and integrity of our

24

prosecutors and trial courts in order to pause and wonder . . . whether we have maintained the proper level of vigilance. Today, as when *Batson* was decided, it is a troubling reality, rooted in history and social context, that our black citizens are generally more skeptical about the fairness of our criminal justice system than other citizens. Yet it is precisely to ensure public confidence in our courts and their verdicts that *Batson* 'forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant.' (*Batson*, *supra*, 476 U.S. at p. 89.)" (*People v. Harris*, *supra*, 57 Cal.4th at pp. 865–866 (conc. opn. of Liu, J.).)

In this day and age, we are unlikely to encounter direct evidence of purposeful discrimination in jury selection. But discrimination is no less real for being subtle. That is why review of a *Batson* ruling " 'demands a sensitive inquiry into such circumstantial . . . evidence of intent as may be available.' " (*Foster*, *supra*, 578 U.S. at p. __ [136 S.Ct. at p. 1748].) Here that inquiry leads me to conclude that, more likely than not, the jury that convicted Hardy and sentenced him to death was not selected free of improper discrimination.

I respectfully dissent.

**LIU, J.**

25

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Hardy

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S113421
**Date Filed:** May 31, 2018

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** John David Lord

_____

**Counsel:**

Susan K. Shaler, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Lance E. Winters, Assistant Attorney General, Keith H. Borjon, Joseph P. Lee and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Susan K. Shaler
991 Lomas Santa Fe Drive, Suite C, #112
Solana Beach, CA 92075
(858) 259-6737

Michael J. Wise
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 897-2381